**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Lan Hoang
Email: lhoang@bakerlaw.com
Edward J. Jacobs
Email: ejacobs@bakerlaw.com
Brian W. Song
Email: bsong@bakerlaw.com
Sarah Jane T.C. Truong
Email: struong@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | Adv. Pro. No. 08-01789 (BRL) |
| | SIPA LIQUIDATION |
| Debtor. | (Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 09-1182 (BRL) |
| v. | |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | **THIRD AMENDED COMPLAINT** |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), and the consolidated estate of Bernard L. Madoff

(individually "Madoff," and collectively with BLMIS the "Debtors"), by and through the

Trustee's undersigned counsel, for his Third Amended Complaint, states as follows:

## NATURE OF THE PROCEEDING

1.      The Trustee seeks to avoid preferential and fraudulent transfers received by one or

more of the Defendants, hereinafter defined, and recover the transfers or their value from the

Defendants, including any general partner with legal liability for partnership obligations, and/or

any subsequent transferees who received any portion of the initial transfers from BLMIS, and all

further relief as the Court deems just, proper, and equitable.

2.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff through BLMIS and a network of individuals and entities integral to perpetuating the

fraud and who profited from it.  The scope and duration of Madoff's scheme would not have

been possible without various "feeder funds," funds that invested all or a portion of their

investors' capital with BLMIS, and the managers of such funds who were complicit in Madoff's

scheme.

3.      One of the individuals who helped Madoff perpetuate his fraud was Defendant J.

Ezra Merkin ("Merkin"), a sophisticated investment manager who was a close business and

social associate of Madoff.  Merkin worked with BLMIS and Madoff to commit, and expand, the

single largest financial fraud in history.  Merkin was an active participant in, and substantially

aided, enabled, and helped sustain Madoff's Ponzi scheme.  Merkin, individually and through his

company, Gabriel Capital Corporation, managed several investment funds that maintained

investment accounts with BLMIS, including: (i) Gabriel Capital, L.P.; (ii) Ariel Fund Limited;

(iii) Ascot Partners, L.P.; and (iv) Ascot Fund Limited (collectively the "Defendant Funds").

4.      The Defendant Funds aggregated money from investors and placed substantial

amounts of this capital with BLMIS.  The Defendant Funds collectively were one of the largest

feeder funds, based upon deposits into BLMIS.  From at least 1995 through 2008, the Defendant

Funds collectively withdrew at least $560 million from BLMIS prior to the collapse of the Ponzi

scheme.  These withdrawals by the Defendant Funds are customer property, as defined by SIPA,

15 U.S.C. § 78*lll*(4), and must be returned to the Trustee for equitable distribution to BLMIS

customers.

5.      Merkin, individually and/or through Gabriel Capital Corporation, received or

claimed entitlement to at least $256,157,566: (i) $194,022,536 in management fees associated

with Defendant Ascot Partners L.P.'s and its offshore component Defendant Ascot Fund Ltd.'s

investments with BLMIS from 1993 through 2008; and (ii) $62,135,030 in management and

incentive fees associated with Defendants Gabriel Capital L.P.'s and Ariel Fund Ltd.'s

investments with BLMIS from 2000 through 2007.  These management and performance fees are

avoidable and recoverable customer property, as defined by SIPA, 15 U.S.C. § 78*lll*(4), or are

otherwise recoverable, and should be returned to the Trustee for equitable distribution to BLMIS

customers.

## JURISDICTION AND VENUE

6.      This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities and Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred

to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§ 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

7.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H), and (O).

The Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

8.    Venue in this judicial district is proper under 28 U.S.C. §§ 1391(b) and 1409.

9.    This adversary proceeding is brought pursuant to 15 U.S.C. §§ 78fff(b) and 78fff-

2(c)(3), 11 U.S.C. §§ 105(a), 502(a) and (b)(1), 544(b), 547, 548(a), 550(a), and 551, and the

New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. Law § 270 *et seq.* (McKinney

2001)), and other applicable law: (a) seeking to avoid and recover preferential and fraudulent

transfers and conveyances or their value, and disallowance of claims in connection with certain

transfers of customer property by BLMIS to or for the benefit of the Defendants; (b) objecting to

any claims of the Defendants against the BLMIS estate because they are invalid; and (c) all other

relief as this Court deems just, proper, and equitable.  With respect to the avoidable transfers the

Defendants received, the Trustee seeks further to set them aside and preserve the property for the

benefit of BLMIS's defrauded customers.

## BACKGROUND, THE TRUSTEE, AND STANDING

10.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including, *inter alia*, securities fraud,

investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and

Exchange Commission ("SEC") filed a complaint in the District Court commencing the District

Court Proceeding against Madoff and BLMIS, which remains pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

11.     On December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order that appointed Lee S. Richards, Esq. as receiver for the assets of BLMIS.

12.     On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS could not meet its obligations to securities customers as they came due, and, accordingly, its customers needed the protections afforded by SIPA.

13.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    (a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);

    (b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and

    (c)     removed the case to this Court pursuant to 15 U.S.C. § 78eee(b)(4), and removed the receiver.

14.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

15.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court entered an order substantively consolidating the chapter 7 estate of Madoff into the SIPA Proceeding.

16.     At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23: 14-17.)  Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (*Id.* at 23: 20-21.)  On June 29, 2009, Madoff was sentenced to 150 years in prison.

17.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with customers' accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

18.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.

19.     At a plea hearing on December 20, 2012, in the case captioned *United States v. Peter Madoff*, Case No. 10-CR-228 (LTS), Peter Madoff, Madoff's brother and the chief compliance officer at BLMIS, pleaded guilty to a two-count criminal information charging him with falsifying records and conspiracy to commit securities fraud.  He received a ten year sentence and must forfeit $143 billion to the U.S. Department of Justice.

20.     As the Trustee appointed under SIPA, the Trustee is charged with assessing

claims, recovering and distributing customer property to BLMIS's customers holding allowed

customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its

creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and

recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and

others to the detriment of defrauded, innocent customers whose money was consumed by the

Ponzi scheme.  Absent this and other recovery actions, the Trustee cannot satisfy the claims

described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

21.     Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a

bankruptcy trustee in a case under the Bankruptcy Code, besides the powers granted by SIPA

under 15 U.S.C. § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the

Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to 15

U.S.C. § 78fff(b).

22.     Pursuant to 15 U.S.C. § 78*lll*(7)(B), the Filing Date is deemed to be the date of the

filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and

the date of the commencement of the case within the meaning of section 544 of the Bankruptcy

Code.

23.     The Trustee has standing to bring the avoidance and recovery claims under

15 U.S.C. § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including

11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to

avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and

15 U.S.C. §§ 78fff-1(a) and 78fff-2(c)(3). The Trustee has standing to object to customer and

creditor claims under 15 U.S.C. § 78fff-1(a) and 11 U.S.C. § 502(a), because the Trustee has the

power and authority to satisfy customer claims to the extent they are established to the

satisfaction of the Trustee under 15 U.S.C. § 78fff-2(b) and the Order on Application for an

Entry of an Order Approving Form and Manner of Publication and Mailing of Notices,

Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing

Other Relief entered on December 23, 2008 [ECF Doc. 12].  By his objection, the Trustee has

the authority to seek disallowance of any customer and creditor claims that are unenforceable

against the Debtors or their property under 15 U.S.C. § 78fff-1(a) and 11 U.S.C. § 502(b)(1) and

applicable non-bankruptcy law.

## THE PONZI SCHEME

24.    Madoff founded BLMIS in or about 1960 as a sole proprietorship, and under the

laws of the State of New York formed a limited liability company on January 1, 2001.  For most

of its existence, BLMIS operated from its principal place of business at 885 Third Avenue, New

York, New York.  Madoff, as founder, sole owner, chairman, and chief executive officer,

operated BLMIS with several family members and several additional employees, some of whom

have pleaded guilty to helping Madoff carry out his fraudulent scheme.  BLMIS had two

business units: (i) the investment advisory business (the "IA Business"); and (ii) the market

making and proprietary trading business.

25.    During the early 1970s through the early 1990s, Madoff claimed to invest

customer funds using a "convertible arbitrage investment strategy," by which investors would

gain profits from a change in the expectations of the stocks or convertible securities over time.

26.    From about the 1990s forward, Madoff outwardly ascribed the IA Business'

consistent investment success to his investment strategy called the "split-strike conversion"

strategy ("SSC Strategy").  Madoff generally promised investors that their funds would be

7

invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100

Index"), which is a collection of the 100 largest, publicly traded companies, as determined by the

Standard & Poor's Index Committee.  The basket of stocks was intended to mimic the movement

of the S&P 100 Index.  Madoff claimed that he would carefully time purchases and sales to

maximize value, and that customer funds would intermittently be out of the market.  During

these times, Madoff claimed that the funds would be invested in United States Treasury

securities.  The second part of the SSC Strategy involved selling call options and buying put

options on the S&P 100 Index, which is commonly referred to as a "collar."  Madoff purported

to purchase and sell option contracts to control the downside risk of price changes in the basket

of stocks correlated to the performance of the S&P 100 Index.  Based on the Trustee's

investigation, there is no record of BLMIS having cleared a single purchase or sale of securities

in connection with the SSC Strategy at the Depository Trust & Clearing Corporation, the

clearing house for such transactions, or any other trading platform on which BLMIS could have

traded securities.

27.    All traded options related to the companies within the S&P 100 Index, including

options based upon the S&P 100 Index itself, cleared through the Options Clearing Corporation

("OCC").  Based on the Trustee's investigation, the OCC has no records of IA Business

transactions in any exchange-listed options.

28.    At the Plea Hearing, Madoff admitted that BLMIS never purchased any of the

securities it claimed to have purchased for IA Business customers in connection with the SSC

Strategy.

29.    For a limited group of IA Business customers, particularly, certain of Madoff's

friends and family, he did not follow either the convertible arbitrage strategy or SSC Strategy,

but claimed to have purchased securities held for a time and later sold for profit. In reality, Madoff conducted no such securities trades.

30.     Even though customers of the IA Business received monthly or quarterly statements purportedly showing the securities held in, or traded through, their accounts, and growth and profits in those accounts over time, that trading activity was a fabrication. No securities were ever purchased or sold for customers, and the profits reported were entirely fictitious.

31.     Prior to Madoff's arrest, BLMIS purportedly conducted trades on the over-the-counter ("OTC") market after hours. To bolster that lie, BLMIS periodically wired tens of millions of dollars to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity owned by Madoff. There are no records that MSIL ever used the wired funds to purchase securities or options for customers of the IA Business.

32.     Madoff operated the IA Business as a Ponzi scheme. The money received from customers of the IA Business was not set aside to buy securities or options, as Madoff purported, but instead was used primarily to make distributions to, or payments for, other BLMIS customers. The falsified monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments. In reality, BLMIS had not invested its customers' funds but paid customers based upon the inflated amounts reflected in their fake securities transactions, as if those amounts were genuine. The money sent to BLMIS for investment was used to keep the fraudulent scheme operating and to enrich Madoff, his associates, and others, until the requests for redemptions in 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

33.     Instead of investing customer funds, BLMIS used customer funds to prop up its business operations and to pay redemption requests to or on behalf of other customers, and to make other improper transfers.  Due to the siphoning and diversion of new investments to make these improper payments, BLMIS did not have sufficient funds to pay all customer requests for withdrawals.  BLMIS was able to perpetuate the fraud only by using the principal invested by some customers to pay other customers or their designees.

34.     BLMIS did not register as an Investment Advisor with the SEC until in or about August 2006.  At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser Registration), representing, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $11.7 billion.

35.     In or about January 2007, BLMIS filed with the SEC its required annual amendment to its Form ADV.  It represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $13.2 billion.

36.     In or about January 2008, BLMIS filed with the SEC its required annual amendment to its Form ADV.  It represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.  In reality, by November 2008, BLMIS had approximately 4,898 active customer accounts with a purported value of approximately $64.9 billion under management.

37.     Madoff also had false audit reports prepared by Friehling & Horowitz, CPA's P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York. Of the three employees at the firm, one employee was an assistant and one was a semi-retired accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole

proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports on behalf of

BLMIS and filing false tax returns on behalf of Madoff and others.

38.     BLMIS's liabilities were billions of dollars greater than its assets.  BLMIS was

insolvent because: (i) its assets were worth less than the value of its liabilities; (ii) it could not

meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS

was left with insufficient capital.

## THE DEFENDANTS

39.     Defendant J. Ezra Merkin ("Merkin") is a resident of the State of New York,

residing at 740 Park Avenue, New York, New York 10021.

40.     Merkin is experienced in the investment management industry.  In addition to

managing the Defendant Funds through Gabriel Capital Corporation ("GCC"), Merkin served as

a Managing Partner of Gotham Capital L.P., an investment partnership, from 1985 to 1988.

Merkin was associated with Halcyon Investments from 1982 to 1985 and with the law firm of

Milbank, Tweed, Hadley & McCloy from 1979 to 1982.  Merkin also served as chairman of the

board of the General Motors Acceptance Corporation from 2006 to 2009, but was forced to

resign after the fraud at BLMIS became public.

41.     Merkin also served on numerous boards and committees for various non-profit

institutions, including: the Ramaz School, Yeshiva University, the Beyeler Foundation and

Museum, Carnegie Hall, Columbia College, the Gruss Foundation, and the Levy Economics

Institute of Bard College.  He also served as the chairman of the investment committees of

Yeshiva University and the UJA Federation of New York and served on the investment

committee of Carnegie Hall.  Yeshiva University and the Ramaz School were investors in Ascot

Partners, L.P.

42.     Defendant GCC is a corporation, organized under the laws of Delaware, with a principal place of business at 450 Park Avenue, #3201, New York, New York 10022.  GCC was incorporated in December 1988 as Ariel Management Corporation and changed its name to Gabriel Capital Corporation in January 1998.  GCC is an investment adviser and investment management company.  Merkin and GCC are collectively referred to herein as the "Merkin Defendants."

43.     From the time of GCC's organization until sometime after Madoff's arrest on December 11, 2008, Merkin was the sole shareholder, sole director, and sole decision-maker for GCC.

44.     Defendant Gabriel Capital, L.P. ("Gabriel") is a Delaware limited partnership formed in or around 1989, and was originally known as Ariel Capital, L.P., a domestic fund for U.S. investors, with a principal place of business at 450 Park Avenue, #3201, New York, New York 10022.  Gabriel invested directly with BLMIS.

45.     Merkin was at all relevant times the sole general partner of and the sole decision-maker for Gabriel.  Gabriel is in receivership and is being liquidated.

46.     Investors in Gabriel are limited partners of Gabriel.

47.     Defendant Ariel Fund Limited ("Ariel") is a Cayman Islands exempted company formed on December 28, 1988, with a principal place of business at 450 Park Avenue, #3201, New York, New York 10022.  It is organized as a private investment fund for foreign investors and others, including non-profit organizations, and not subject to certain U.S. taxes.  Ariel invested directly with BLMIS.  GCC was at all relevant times the sole investment advisor to Ariel.  Merkin was the sole decision-maker for Ariel.

48.     According to the Ariel Prospectus dated November 2002, GCC had "full discretionary authority to invest the assets of [Ariel]."

49.     Investors in Ariel hold non-voting shares in the fund.  All of the voting shares of Ariel are owned by GCC, and thus controlled by Merkin.  Ariel is in receivership and is being liquidated.

50.     Defendant Ascot Partners, L.P. ("Ascot") is a Delaware limited partnership formed in 1992, with a principal place of business at 450 Park Avenue, #3201, New York, New York 10022.  Ascot invested directly with BLMIS.

51.     Ascot is insolvent, and its assets cannot satisfy any judgment on the claims asserted herein.  Merkin was at all relevant times the sole general partner of and the sole decision-maker for Ascot, and is responsible for the liabilities of Ascot.  Ascot is in receivership and is being liquidated.

52.     Merkin created Ascot for the principal purpose of investing with BLMIS.

53.     Defendant Ascot Fund Limited (the "Former Ascot Fund") is an offshore fund incorporated in the Cayman Islands in 1992, with its principal place of business at 450 Park Avenue, New York, New York.  The Former Ascot Fund invested directly with BLMIS.  Ariel Management Corporation, later known as GCC, served as the investment advisor to the Former Ascot Fund until January 2003.

54.     Like Ascot, Merkin created the Former Ascot Fund for the principal purpose of investing with BLMIS.  Merkin, as Ariel Capital Management's and later GCC's sole shareholder, was at all relevant times the sole decision-maker for the Former Ascot Fund, and managed or otherwise directed the business of the fund from New York.

55.     In early 2003, the Former Ascot Fund entered into a "master-feeder" relationship with Ascot whereby the Former Ascot Fund invested substantially all of its capital with Ascot as a limited partner.  On or about the same time, the Former Ascot Fund transferred the full balance of its account to the BLMIS account of Ascot and ceased activity in its account with BLMIS.

## THE DEFENDANT FUNDS' INVESTMENTS WITH BLMIS

**A.      Gabriel and Ariel**

56.     From October 1990 through February 1993, Ariel held BLMIS account number 1FN004 and deposited $21,683,703 before ceasing activity in its account and transferring its assets to BLMIS account 1FN005, which was held in the name of the Former Ascot Fund.

57.     Ariel opened a new BLMIS account in August 2000.  It held BLMIS account number 1FR070 from August 2000 through December 2008.

58.     From 2000 through 2008, Ariel invested between approximately 8% and 30% of its total assets under management with BLMIS.

59.     Upon information and belief, as of the third quarter of 2008, Ariel had at least 78 investors and a reported total of $1.3 billion under management.

60.      From October 1990 through February 1993, Ariel Capital L.P., Gabriel's predecessor entity, held BLMIS account number 1A0042 and deposited $13,628,922 before transferring its assets to BLMIS account number 1A0058, which was held in the name of Ascot, and ceasing activity in its account.

61.     Gabriel opened a new BLMIS account in August 2000.  It held BLMIS account number 1G0321 from August 2000 through December 2008.

62.     From 2000 to 2008, Gabriel invested between approximately 7% and 30% of its total assets under management with BLMIS.

63.     Upon information and belief, as of the third quarter of 2008, Gabriel had at least 200 investors and a reported total of $1.4 billion under management.

**B.      The Former Ascot Fund and Ascot**

64.     The Former Ascot Fund opened BLMIS account number 1FN005 in January 1992.  In January 1993, the Former Ascot Fund received transfers from at least nine other BLMIS accounts (1FN016 in the name of EBRO NV; 1W0041 in the name of Manny H. Weiss; 1FN042 in the name of Willy R. Strothotte; 1FN022 in the name of Langham Trading Inc.; 1FN039 in the name of Dunraven NV; 1FN031 in the name of Sandpiper Fund Ltd II #2; 1FN030 in the name of Sandpiper Fund Ltd; and 1FN020 in the name of Heaton Fund Limited) to its BLMIS account, including transfers from Ariel's 1FN004 account.

65.     Ascot opened account number 1A0058 with BLMIS in January 1993.  In January and February 1993, Ascot received transfers from at least four other BLMIS accounts (1B0079 in the name of the Eric Bruell Trust; 1W0041 in the name of Manny H. Weiss; 1H0037 in the name of Richard L. Hirsch; and 1A0042 in the name of Ariel Capital L.P.) to its BLMIS account number 1A0058.

66.     Since 1993, Ascot invested between approximately 88% and over 100% of its listed assets under management with BLMIS.

67.     From 1992 through 2002, the Former Ascot Fund invested between approximately 74% and over 100% of its listed assets under management with BLMIS.

68.     Upon information and belief, as of November 2008, Ascot had about 300 investor accounts with approximately $1.8 billion under management.  The $1.8 billion amount was a fictitious figure based on profits reported by BLMIS.

## THE TRANSFERS

69.     Each of the Defendant Funds was a client of the IA Business.  According to BLMIS's records, each of the Defendant Funds maintained its accounts with BLMIS as set forth on Exhibit A (the "Accounts").  The Accounts were opened on or about the dates set forth on Exhibit A.

70.     Each of the Defendant Funds, through or at the direction of its agent, Merkin, executed a BLMIS Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements"), and delivered such papers to BLMIS at its headquarters at 885 Third Avenue, New York, New York.

71.     By their terms, the Account Agreements were deemed entered into in the State of New York and were to be performed in New York, New York, through alleged securities trading activities that would take place in New York, New York.  As the Defendants knew, the Accounts were held in New York, New York, and the Defendants consistently wired funds to BLMIS's bank account in New York, New York, for application to the Accounts and the alleged trading activities.

72.     Beginning in 1990, the Defendant Funds invested heavily with BLMIS.  Between October 1, 1990 and the Filing Date, the Defendant Funds invested over one billion dollars with BLMIS through at least 68 separate wire transfers directly to BLMIS.  From at least 1998 through 2008, the BLMIS bank account at JPMorgan Chase & Co. that received the transfers was Account # xxxxxx703 (the "BLMIS Bank Account").  For nearly two decades, the Defendants intentionally benefited by conducting transactions in the State of New York and are subject to the jurisdiction of this Court for purposes of this adversary proceeding.

73.     Prior to the Filing Date, BLMIS made payments or other transfers out (collectively, the "Initial Transfers") to one or more of the Defendant Funds.  The Initial Transfers were made to or for the benefit of one or more of the Defendant Funds and include, but are not limited to, the Initial Transfers listed on Exhibit B.  In addition, the Defendant Funds transferred at least $361.4 million, cumulatively, out of their respective BLMIS accounts as set forth *infra* ¶¶ 268-280.

74.     The Defendant Funds received the Initial Transfers in accounts held at Morgan Stanley.  Ascot held Morgan Stanley Account No. xx-xx021.  Gabriel held Morgan Stanley Account No. xx-xx003.  Ariel held Morgan Stanley Account No. xx-xx001.

75.     Prior to the Filing Date, GCC made transfers of at least $116.9 million from its Morgan Stanley account to accounts held by the other Defendants.  Ascot also made transfers of at least $322.9 million from its Morgan Stanley account to accounts held by the other Defendants.  Ariel also made transfers of at least $158.5 million from its Morgan Stanley account to the accounts held by the other Defendants.  Gabriel also made transfers of at least $403.6 million from its Morgan Stanley account to accounts held by the other Defendants.  All of these transfers were customer property that originated from the Defendant Funds' accounts with BLMIS.

76.     Prior to the filing date, GCC received transfers of at least $298.4 million in its accounts from the Defendant Funds' Morgan Stanley accounts.  Ascot received transfers of at least $224.9 million in its Morgan Stanley account from accounts held by the other Defendants.  Former Ascot Fund received transfers of at least $82 million from Ascot's Morgan Stanley account.  Ariel received transfers of at least $139.1 million in its accounts from accounts held by the other Defendants.  Gabriel received transfers of at least $138.6 million in its Morgan Stanley

17

account from accounts held by the other Defendants.  Merkin received transfers of at least $119

million to his personal bank accounts from GCC's and Gabriel's Morgan Stanley accounts.  All

of these transfers from the Defendant Funds to GCC, from GCC to Merkin, and from Ascot to

Ariel, Gabriel, and the Former Ascot Fund are collectively the "Subsequent Transfers," and set

forth on Exhibit C.

77.   Based on the Trustee's investigation to date, the Subsequent Transfers to GCC of

at least $298 million from the Defendant Funds are recoverable from GCC pursuant to section

550 of the Bankruptcy Code and § 278 of the N.Y. Debt. & Cred. Law.

78.   Based on the Trustee's investigation to date, the Subsequent Transfers to Merkin

from GCC of at least $119 million are recoverable from Merkin pursuant to section 550 of the

Bankruptcy Code and § 278 of the N.Y. Debt. & Cred. Law.

79.   Based on the Trustee's investigation to date, the Subsequent Transfers to Ariel of

at least $139 million from GCC and the other Defendant Funds are recoverable from Ariel

pursuant to section 550 of the Bankruptcy Code and § 278 of the N.Y. Debt. & Cred. Law.

80.   Based on the Trustee's investigation to date, the Subsequent Transfers to Gabriel

of at least $138 million from GCC and the other Defendant Funds are recoverable from Gabriel

pursuant to section 550 of the Bankruptcy Code and § 278 of the N.Y. Debt. & Cred. Law.

81.   Based on the Trustee's investigation to date, the Subsequent Transfers to the

Former Ascot Fund of at least $82 million from GCC and the other Defendant Funds are

recoverable from the Former Ascot Fund pursuant to section 550 of the Bankruptcy Code and

§ 278 of the N.Y. Debt. & Cred. Law.

## MERKIN'S LONGSTANDING BUSINESS
## AND SOCIAL RELATIONSHIP WITH MADOFF

82.    Merkin enjoyed unusually intimate access to Madoff as a result of their longstanding business and social relationship.  In fact, Madoff described Merkin as "a good friend" and "a very good client."

83.    Upon information and belief, Merkin was first introduced to Madoff in the 1980s through his father, Hermann Merkin.

84.    Merkin was closely associated with Madoff on a business and social level since at least the late 1980s.  Upon information and belief, Madoff attended Merkin's children's bar and bat mitzvahs.

85.    Merkin and Madoff were involved with Jewish philanthropies together and, among other things, sat on the board of trustees of Yeshiva University.

86.    Although Madoff was notoriously secretive, Merkin touted his close personal relationship with Madoff to others and led them to believe that he had exceptional access to Madoff because of this personal relationship.

87.    Merkin was able to speak personally with Madoff whenever he desired and would call Madoff directly if he had questions or concerns regarding the Defendant Funds' investments with BLMIS.  Merkin took advantage of this access, meeting with Madoff at BLMIS's offices.

88.    Merkin acted as a gatekeeper for Madoff, and selectively chose which investors or prospective investors he would allow to meet with Madoff.

89.    Merkin told representatives of Ivy Asset Management ("Ivy") in various meetings in 1997 that Merkin's family has "had money with Bernie for 20 years."  They were also told that Merkin was a fiduciary to Madoff's children.

90.     In June 2003, Merkin told representatives of an investor in Ascot (referred to herein as "Research Company A") of his deep personal ties with Madoff. Merkin "implied frequent communication," and stated that he had just spoken to Madoff the day before. Merkin told Research Company A that he "is a trustee for Madoff's kids and has a role in the will," that "Bernie was the executor of Ezra's father's will," and that Merkin's brother and brother-in-law worked for Madoff. Merkin also told Research Company A that he had trade tickets relating to his family's BLMIS account dating back to 1978.

## THE DEFENDANTS' INVOLVEMENT IN AND KNOWLEDGE OF MADOFF'S FRAUD

### A.    Defendants' Actual Knowledge of Fraud at BLMIS

91.     The Defendants knew that the securities trading BLMIS purported to engage in on their behalf was impossible, the purported results of those trading activities were fictional, and the IA Business was predicated on a fraud.

92.     Time after time, when confronted with evidence that BLMIS was a fraud, Merkin did not deny it or attempt to explain. Instead, he openly admitted that BLMIS's results were impossible and defied any legitimate explanation. His response to some investors' concerns was to discourage them from asking too many questions, and rather simply to accept BLMIS's purported results. To other investors, Merkin lied: denying, omitting, or misrepresenting the scale of the Defendant Funds' investments with BLMIS.

93.     On some occasions, Merkin even specifically acknowledged that Madoff's conduct and BLMIS's results were consistent with a Ponzi scheme—including during conversations with Madoff himself. In the course of their relationship, Merkin recorded several telephone conversations he had with Madoff, including one where Merkin articulated concerns

20

about fraud to Madoff.  In the fall of 2005, following the public disclosure that the Bayou Group

was a Ponzi scheme, Merkin told Madoff:

> You know, I always tell people, as soon as there is a scam in the
> hedge fund industry, someone is going to call about Bernie
> [Madoff].  It's guaranteed.

94.     Merkin also conceded that BLMIS might be a Ponzi scheme in a 2003 meeting

between Merkin and Research Company A.  Research Company A contacted Merkin to review

Ascot's BLMIS account statements and discuss questions regarding Madoff's strategy.

95.     On June 27, 2003, Research Company A's representatives spoke with Merkin on

the telephone, and took detailed notes of the conversation.  Research Company A's notes

attribute many direct quotes to Merkin, some of which reveal that Merkin did not deny that

Madoff was engaged in fraud but in fact openly admitted that Madoff appeared to be operating a

Ponzi scheme.  Due to the inherent nature of Ponzi schemes, Merkin advised Research Company

A of the dangers in investing significant amounts for the long term with BLMIS and to "[n]ever

go long in a big way."  Merkin even quipped that:

> Charles Ponze [*sic*] would lose out because it would be called the
> "Madoff Scheme."

96.     At that same meeting, Merkin acknowledged the impossibility of the volume of

Madoff's purported trading activity, specifically whether there was enough volume in the market

to "accommodate" BLMIS's large options trades.  He told Research Company A, "I have come

to accept there are things that I don't understand [about Madoff]," which caused Research

Company A to note that "Ezra did not have a good explanation for how Madoff executes option

trades in such size."

97.     Besides these admissions, Merkin acknowledged to Research Company A critical

concerns with BLMIS, including: (a) the lack of separation between BLMIS's investment

advisory and market making/proprietary trading businesses; (b) BLMIS's surprising lack of overnight exposure; (c) BLMIS's practice of moving to U.S. Treasurys at quarter end contravened the opportunistic nature of the SSC Strategy; (d) BLMIS's self-clearing; and (e) the possibility that BLMIS's reported trades were outside the reported daily trade price range.

98.    In its summary of the meeting with Merkin, Research Company A concluded: "Seems to be some probability even in Ezra's mind that this could be a fraud."

99.    Additionally, Merkin discussed serious concerns regarding the bona fides of BLMIS with Ivy, and Merkin admitted his inability to adequately investigate BLMIS's legitimacy.  Ivy's notes show that Ivy raised questions to Merkin regarding peculiarities within Madoff's strategy, including the fact that the options market lacked the volume necessary to sustain BLMIS's trading.  Merkin acknowledged he was "aware" of this problem.

100.    Merkin responded to challenges from Ivy on the consistency and similarity of the returns in all BLMIS accounts.  Merkin did not attempt to explain but instead simply stated:

> [U]nderstanding Madoff is like finding Pluto . . . you can't really
> see it . . . you do it through inference, its effect on other objects.

101.    Merkin also analogized Madoff to the Wizard of Oz.  Ivy commented that "Toto is still tugging at the curtain," to which Merkin replied, "I would say that the curtain is winning."

102.    Merkin was well aware that BLMIS's purported trading activity was impossible. Victor Teicher, a money manager employed by Merkin to manage portions of Ariel and Gabriel's portfolios for various years between 1988 and 2000, also warned Merkin about investing with BLMIS because "[Madoff's] returns were too consistent" and because the combination of low volatility and high returns as reported by Madoff was not believable. Teicher warned Merkin that it was "just not possible" for Madoff's strategy to have returns as consistent as Madoff claimed.

103.    Teicher also raised his concern to Merkin regarding BLMIS's self-clearing of its own trades, warning that there had been prior instances of fraud that involved self-clearing. After Madoff's fraud was revealed, Merkin acknowledged, "what made [the fraud] possible was the fact that Madoff was the custodian."

104.    In 1994, Teicher began serving a prison sentence in connection with a conviction for insider trading.  He left prison in 1995 and was again hired by Merkin to manage portions of the Ariel and Gabriel portfolios from 1998 through 2000.

105.    Jack Mayer was employed by Teicher when Teicher managed portions of Ariel and Gabriel and later became employed by GCC in the mid-1990s after Teicher left prison. Mayer was present for a meeting in which Teicher raised concerns to Merkin regarding BLMIS and specifically recalls Teicher telling Merkin that BLMIS "could be a Ponzi scheme."

106.    Documents in Merkin's own designated "Madoff" folder also demonstrate that Merkin well knew that BLMIS could not have been legitimately engaged in the trading activity it reported.  A February 20, 1996 document detailing a third party's analysis of BLMIS's returns was not only marked up by Merkin, but also kept by Merkin in his "Madoff" folder.  The document analyzed BLMIS's performance and noted it was "to a large degree independent of the gyrations of the S&P500," and that BLMIS achieved its incredible performance "whether the S&P 500 trends up or down."

107.    The third party's analysis also contained a chart depicting the significant gulf between BLMIS's performance (labeled "Series B") and that of the S&P 500.  Madoff's strategy was entirely dependent on investing in stocks and options in the S&P 100 market, whose performance also highly correlates to the performance of S&P 500:

**1. Performance Chart of Manager Series B\* and S&P500**



108.    Despite Merkin's knowledge that Madoff was running a Ponzi scheme, that BLMIS was a fraud, and that Madoff could not have achieved his incredible returns, Merkin never pressed Madoff for an explanation but instead participated in Madoff's fraud by continuing to invest money with BLMIS to reap significant management and performance fees.

109.    Based on their actual knowledge of fraud at BLMIS, the Defendants misled certain investors as to Madoff's role in the operation of the Defendant Funds, and in fact sought to conceal from investors Madoff's involvement in the Defendant Funds' investments and/or the amount of investment with BLMIS.

B.     **Ariel's and Gabriel's Offering Documents and Other Disclosures Contained Misrepresentations and Other Omissions**

110.    Certain investors were misled by Ariel's and Gabriel's offering documents and other disclosures.  These documents and materials provided that Merkin individually, as Gabriel's general partner and sole owner and decision-maker of Ariel's investment advisor GCC, had the "ultimate responsibility for the management, operations and investment decisions."

111.    Despite this role, Merkin delegated investment decisions for the Defendant Funds to Madoff, Teicher, and other outside managers.  For example, from 2002 through 2008, 80% to 95% of Gabriel's and Ariel's assets were managed by three outside money managers:  BLMIS, Cerberus Capital Management ("Cerberus"), and Cohanzick Capital, L.P. ("Cohanzick").

112.    The offering documents for Ariel and Gabriel did not disclose Madoff's involvement with the funds.

113.    The offering documents for Ariel represented that it was "concentrated in the purchase of securities which are subject to reorganizations," which was defined to include "tender offers, mergers, liquidations, recapitalizations, bankruptcies, spin-offs and other similar transactions."

114.    The offering documents for Gabriel represented that it "engages primarily in investments in private debt claims and publicly traded securities of bankrupt and distressed companies and in risk arbitrage."

115.    Madoff's purported SSC Strategy was not consistent with the distressed debt and risk arbitrage strategies identified in Ariel's and Gabriel's offering documents.

116.    From at least 1991 through 2008, Merkin's primary form of communication, through GCC, with Ariel and Gabriel investors was through quarterly newsletters that provided details regarding his investment strategy, the performance of the funds, and general information

25

about the financial markets.  Many of these newsletters discussed specific investments being

made by Ariel and Gabriel, including investments through Cerberus.  Over a seventeen year

period, however, these newsletters did not disclose that between approximately 7% and 30% of

Ariel's and Gabriel's assets were invested with BLMIS.

117.    The investment strategies described in Merkin's quarterly newsletters to investors

for Ariel and Gabriel stated that 100% of Ariel's and Gabriel's investments were in distressed

debt and risk arbitrage and did not reference Madoff's SSC Strategy.

118.    Madoff's purported SSC Strategy was inconsistent with the distressed debt and

risk arbitrage strategies identified in the quarterly newsletters for Ariel and Gabriel.

119.    Certain investors of Ariel and Gabriel have confirmed they were misled by these

newsletters.  They understood the information provided by the Merkin Defendants to represent

the complete portfolio for the funds, but they did not learn of their significant exposure to

BLMIS until after Madoff's arrest.

**C.    Misrepresentations and Omissions in Ascot's and the Former Ascot Fund's Offering
Documents and Other Disclosures**

120.    Certain investors were misled by Ascot's and the Former Ascot Fund's offering

documents and other disclosures.  These documents and materials provided that Merkin was

involved in Ascot's management on a day-to-day and transaction-by-transaction basis, and that

Ascot's success depended upon Merkin's skill as a money manager.  Merkin led his investors to

believe that he was actively managing their investments.  Instead, he was funneling virtually all

of Ascot's investment to BLMIS.

121.    The offering documents for Ascot never identified Madoff or BLMIS as an

investment adviser or money manager for the fund.  It was not until March and October 2006

that Ascot's offering documents belatedly referenced BLMIS—over 14 years after Ascot's

inception.  Even then, these documents misrepresented that BLMIS was only a "prime broker" and "custodian" of the fund.

122.    The offering documents for the Former Ascot Fund were false and misleading in that they also stated that the Former Ascot Fund's success depended on Merkin's skill as a money manager.

123.    The offering documents for the Former Ascot Fund also never identified Madoff or BLMIS as an investment adviser or money manager for the fund.  It was not until September and October 2006 that the Former Ascot Fund's offering document belatedly referenced BLMIS—again over 14 years after the Former Ascot Fund's inception.  Again, these documents misrepresented that BLMIS was only a "prime broker" and "custodian" of the fund.

**D.    Misrepresentations and Omissions to Clients**

124.    Upon information and belief, several individual investors in the Defendant Funds alleged that prior to December 11, 2008: (i) Merkin failed to disclose to them that the Defendant Funds had invested with BLMIS; (ii) misrepresented the amount of exposure the Defendant Funds had with BLMIS; and/or (iii) misrepresented the nature of the Defendant Funds' relationship with BLMIS.

**1.    Ivy Asset Management**

125.    In 1997, Merkin misrepresented to Ivy the amount of the Defendant Funds' investments with BLMIS.  Merkin represented to Ivy that he managed the majority of Ascot's investment personally, noting that only "20% of the capital is managed externally."  However, at that time, Ascot and the Former Ascot Fund were at least 88% and 74% invested with BLMIS, respectively.

2.      **Silver Creek**

126.    Merkin concealed Ariel and Gabriel's investments with BLMIS to certain

investors, including Eric Dillon ("Dillon") of Silver Creek Management and Silver Creek Funds

(collectively, "Silver Creek").  Silver Creek invested hundreds of millions of dollars into Ariel

and Gabriel.  Dillon repeatedly requested information as to the investments made by these funds,

but was never told about Ariel's and Gabriel's exposure to BLMIS until after Madoff's arrest.

127.    Between 1994 and December 2008, Dillon conferred with Merkin personally

approximately twenty times regarding Ariel's and Gabriel's investment strategy and their

investment positions.  Dillon examined the charts contained in Ariel's and Gabriel's newsletters

that purported to reflect all of the funds' categories of investments.  Likewise, Dillon, on more

than one occasion, specifically asked for Ariel's and Gabriel's top five positions, but Merkin

once again failed to disclose their BLMIS investments.  Merkin never disclosed, and Dillon was

unaware, that: (a) Ariel and Gabriel were invested with BLMIS or managed by Madoff; (b) Ariel

and Gabriel used the SSC Strategy; or (c) assets from either fund were in the custody of BLMIS.

128.    The Merkin Defendants misled Dillon and Silver Creek by making false

statements regarding their reliance on third-party managers.  The Merkin Defendants stated that

the only third-party manager employed by Ariel and Gabriel was Cerberus.  On numerous

occasions, Dillon asked the Merkin Defendants to identify who had custody of Ariel's and

Gabriel's assets.  The Merkin Defendants responded that Morgan Stanley primarily had custody.

The Merkin Defendants never mentioned that BLMIS also maintained custody of a significant

portion of the assets.

129.    From 1994 through 2004, Silver Creek invested in another Madoff feeder fund.

Dillon fully redeemed this investment in 2004 because of Madoff concerns.  Dillon would have

28

redeemed Silver Creek's positions if he had been told of Ariel and Gabriel's investment with

BLMIS.

130.    On July 12, 2002, Dillon expressly asked Merkin about the connection between

Madoff and Ascot, and whether Ascot was "a feeder fund" for BLMIS.  Twelve days later,

Merkin acknowledged that Ascot was invested with BLMIS, but provided several misleading

explanations, responding that Ascot was a family fund whereby his "family is the principal but

not the only investor."  Merkin also stated that Ascot was created "for regulatory reasons" and

"Madoff is the principal but not the only manager."

### 3.    Joshua Nash and the Nash Family Partnership

131.    Merkin concealed Gabriel's investment with BLMIS from Josh Nash ("Nash"), a

sophisticated money manager who knew Merkin both socially and professionally for over twenty

years.  Nash invested in Gabriel, both personally and through a family fund called the "Nash

Family Partnership."  Merkin never disclosed that Gabriel had money managed by Madoff

because Merkin knew that Nash had serious suspicions about Madoff's investment strategy.

132.    On several occasions, Nash expressed concerns about Madoff's investment

strategy to Merkin.  Nash's suspicions about Madoff and BLMIS dated back to 1991, when

Nash's father, now deceased, invested with BLMIS.  Nash and his father met with Madoff to

discuss Madoff's strategy, and were not comfortable with Madoff's explanations and BLMIS's

consistently positive returns.  Nash's father also questioned why Madoff used Friehling &

Horowitz, an obscure accounting firm, to audit BLMIS.  As a result of these concerns, Nash's

father fully redeemed from BLMIS approximately eight months after their initial investment and

did not want BLMIS included in their investment portfolio going forward.

133.    From 2000 until Madoff's arrest, Merkin and Nash spoke at least monthly.  Nash
and Merkin served on several committees together, including the Carnegie Hall and UJA
Federation investment committees.  During those years, Nash conveyed to Merkin that he
believed an investment with BLMIS was "highly speculative."  Nash also conveyed to Merkin
that Madoff's failure to use a large, public accounting firm to audit BLMIS was a "potential red
flag."

134.    Despite their lengthy relationship and frequent conversations, Merkin never once
disclosed to Nash that Gabriel invested money with BLMIS.  Following Madoff's arrest, Nash
was "shocked" to learn that Gabriel invested money with BLMIS.  Nash concluded that Merkin
breached his trust by failing to disclose that BLMIS managed or held a portion of Gabriel's
assets.

### 4.    Glen Eagle Partners and Gottlieb

135.    Merkin misled Daniel Gottlieb ("Gottlieb"), the chief investment officer of Glen
Eagle Partners ("Glen Eagle") into believing that Merkin managed the assets of Ascot and
Gabriel without reliance on third-party managers.  From 2005 onward, Glen Eagle and Gottlieb's
family foundation invested $1,500,000 with Ascot and Gabriel.

136.    Merkin actively concealed from Gottlieb his reliance upon third-party mangers,
including Madoff.  After meeting with Merkin to discuss the investments, Gottlieb was led to
believe that Merkin ran an arbitrage strategy himself with the "people who worked in his shop"
executing the trades.  In describing his strategy to Gottlieb, Merkin used the first person plural
pronoun—"we were executing"—which caused Gottlieb to believe that Merkin ran Ascot and
Gabriel from his office and his staff executed trades at their terminals.

137.    Merkin also misled Gottlieb about the composition of Ascot and Gabriel through:
(a) Merkin's conversations with Gottlieb; (b) Gottlieb's review of Gabriel's and Ascot's Offering
Memoranda and other fund documents; and (c) Gottlieb's review of Gabriel's quarterly
newsletters and Ascot's quarterly letters, none of which ever identified BLMIS as a third-party
manager.  Gottlieb had no idea that the majority of Ascot's funds were with BLMIS until after
Madoff's arrest.  That key piece of information was intentionally withheld by Merkin.

138.    If Gottlieb had known that Merkin funneled Ascot's and Gabriel's money to
BLMIS, he would not have invested with Ascot or Gabriel.  Gottlieb's grandfather, Howard
Gottlieb, had invested with BLMIS in the 1980s, but redeemed his investment upon the advice of
Ed Thorp, a well-regarded quantitative analyst, who could not make sense of Madoff's purported
success.

139.    Only after Madoff's arrest did Gottlieb learn that Ascot was a feeder fund for
Madoff, which was a "shock" to him.

### 5.    New York University and Maurice Maertens

140.    Merkin misled New York University's Endowment Fund (the "NYU Endowment
Fund") and its chief investment officer, Maurice Maertens ("Maertens"), regarding its
investment with Ariel.  Upon information and belief, from 1994 through 2008, the NYU
Endowment Fund invested approximately $94 million with Ariel.

141.    In late 2008, Merkin recommended that the NYU Endowment Fund consider
making an investment with BLMIS without disclosing that approximately one-third of Ariel—in
which the NYU Endowment was already invested—was being funneled to BLMIS.

142.    Specifically, in or about October 2008, Merkin met with Maertens to discuss the
status of the NYU Endowment Fund.  Merkin recommended the NYU Endowment Fund invest

31

with BLMIS.  Merkin told Maertens that there was no independent oversight of Madoff's

investment activity.  In response, Merkin was "unequivocally" told that such an investment

would not be suitable for NYU and would not be authorized.  Despite this clear opposition to

investing with BLMIS, Merkin failed to disclose that the NYU Endowment Fund already had

money invested with BLMIS through Ariel.

143.    During its 14 year investment, Merkin failed to disclose that Ariel was invested

with BLMIS to the NYU Endowment Fund until after the Madoff fraud was publicly exposed.

### THE DEFENDANTS KNEW OF IMPOSSIBILITIES AND INDICIA OF FRAUD ABOUT MADOFF AND BLMIS

144.    In addition to the foregoing instances reflecting the Defendants' knowledge of the

fraud at BLMIS, the Defendants willfully blinded themselves to documents and information

demonstrating that BLMIS's IA Business was a fraud.

145.    The Merkin Defendants managed the assets of the Defendant Funds, with

management responsibilities including directing where those assets were to be invested.  The

Merkin Defendants had ultimate responsibility for the management, operations, and investment

decisions made on behalf of the Defendant Funds.  In connection with management duties,

including their duty to perform due diligence on money managers to whom they had delegated

fund assets, the Merkin Defendants were paid or received, directly or indirectly, substantial fees

from the Defendant Funds' transfers from BLMIS.

146.    Due diligence requires the investigation of an investment opportunity, assessment

of the quality of the management team overseeing the investment, assessment of the key risks

associated with the opportunity, and continuous evaluation of the investment on an ongoing

basis.

147.    The Merkin Defendants disseminated several offering memoranda, partnership agreements, and quarterly newsletters to investors and prospective investors of the Defendant Funds that indicated that the Merkin Defendants conducted thorough investigations into all investments that they made with their client assets.

148.    In a quarterly newsletter to his clients, Merkin recognized his duties to his investors, stating, through GCC, that "[o]ur first objective, therefore is to control risk."  He further assured investors that he was diligently protecting their investments stating, "Investors often look up, enchanted by upside and profits, but that works only if their managers spend time and money looking down."

149.    Independent of these representations, Merkin had a fiduciary duty to conduct due diligence on the Defendant Funds' investments.

150.    The Merkin Defendants had a duty to establish due diligence procedures over all the fund managers with whom they invested client assets and a duty to act at all times in the clients' best interest.

151.    In a January 2002 telephone conversation with Madoff, Merkin admitted his purposeful avoidance of performing due diligence on BLMIS.  In Merkin's own words:

> So I told one person, look, you can ask me how Bernie does it and that's fine, but when are you going to ask Bernie? So he said, look, if I asked him, he'd throw me out. I said, look, all I can tell you is don't ask so many questions. Sit tight. And that's what I tell everybody….

152.    The documents in the Defendants' possession identified trading impossibilities, including, but not limited to, that: (i) BLMIS's equity prices fell outside of the reported daily price range for the day Madoff claimed the trades were made; and (ii) BLMIS reported more volume of option contracts traded than were available in the entire exchange market, both of which are obvious trading impossibilities.

153.    The documents and information in the Defendants' possession also identified indicia of fraud including, but not limited to: (i) Madoff's secrecy; (ii) his insistency on BLMIS retaining custody of all stocks and options allegedly purchased on behalf of customers; (iii) BLMIS's extraordinarily consistent trading performance; (iv) BLMIS's untraditional fee structure; and (v) the lack of a qualified auditor.

## A.    Indicia of Fraud:  Madoff's Operations Lacked Transparency

154.    It is a fundamental duty for an investment manager, like Merkin, to investigate and evaluate an investment advisor and his personnel.  Merkin failed to obtain any substantive information regarding the operations of BLMIS despite the numerous significant and specific concerns known to Merkin that suggested fraud.

155.    Madoff and BLMIS operated with little to no transparency.  Madoff refused to or failed to provide information to the Merkin Defendants regarding the number or credentials of his staff.  Madoff also refused to answer, or provided vague and meaningless answers to, even the most basic questions asked by the Merkin Defendants about BLMIS's personnel and operations.  Merkin did not press Madoff for responsive answers.

156.    For example, in a transcript of a phone call between Merkin and Madoff prepared by Defendants, when Merkin questioned Madoff regarding assets under management, Madoff refused to provide an answer.  Merkin did not press Madoff for a response but closed with:  "I don't really care, because I've made my peace with Bernie."

157.    BLMIS's key staff positions were held by members of Madoff's family:  Peter Madoff, Madoff's brother, was the director of trading and chief compliance officer; Mark Madoff and Andrew Madoff, Madoff's sons, were the directors of trading; and Shana Madoff, Madoff's niece, was in-house legal and compliance counsel.

158.    BLMIS's regulatory filings revealed that it lacked the necessary number of employees to manage the billions of dollars of assets under management reported in BLMIS's Form ADV and its later required annual amendments.  BLMIS's regulatory filings also indicated that it had only between one and five employees to perform investment advisory functions, including research.  As Merkin knew, BLMIS clearly lacked the staff necessary to conduct research on the investment opportunities, execute the purported trades in the IA Business, and manage the significant assets under management.

## B.    Impossibility:  Consistent Returns

159.    Because Madoff purported to invest in stocks and options within the S&P 100 Index, BLMIS's returns should have correlated to the S&P 100 Index.

160.    In comparison to the S&P 100, BLMIS consistently generated positive returns from 1989 through 2008.

161.    Indeed, Merkin knew of BLMIS's incredible consistent positive returns from at least 1989 through 1995 based on his knowledge of a third party fund's analysis of BLMIS's performance as described in ¶ 107.

162.    However, regardless of market fluctuations, BLMIS generated consistent positive returns, even when the market suffered extraordinary declines due to the September 11, 2001 terrorist attacks and during the dot-com bubble bust in April 2000 through March 2001.

163.    BLMIS generated cumulatively positive returns of over 45% from 2000 through 2002 while the S&P 100 was down over 43% during the same time period.

164.    For example, during the dot-com bubble bust starting in April 2000 and continuing through March 2001, the Defendant Funds' BLMIS accounts generated returns of about 13%, while the S&P 100 lost approximately 27%.  Despite the downward trend in the

35

market, Merkin deposited $41 million into Ascot's and the Former Ascot Fund's BLMIS

accounts during the same time period.

165.    Additionally, in May 2000, Merkin sought permission from Madoff to open two

new accounts with BLMIS (Gabriel's 1G0321 account and Ariel's 1FR070 account), with the

capacity to add hundreds of millions of dollars at a time when Madoff was supposedly not open

to accepting new accounts.  According to a transcript of a May 2000 telephone call prepared by

the Defendants between Merkin and Madoff, Madoff stated that he was willing to

"accommodate" Merkin because he had been "a good friend" and "a very good client."  During

this same time period, Merkin deposited $74.8 million and $84.2 million on behalf of investors

into Gabriel's and Ariel's BLMIS accounts, respectively.

166.    The Defendant Funds never had a negative yearly return on their BLMIS

investments.  Between 1993 and 2008, according to the Defendants' documents, Ascot and the

Former Ascot Fund only had 11 down months out of 180 months, with only one of these down

months having a negative return that exceeded -1% (a return of -1.4%).  In contrast, the S&P 100

had down months in 65 out of 155 months from January 1996 and November 2008.  Specifically,

from 2004 through and including November 2008, which included the financial crisis of 2007

and 2008, Ascot only had down months in 2 out of the 59 months, while the S&P 100 had 25

down months during the same 59 month period.  As the Former Ascot Fund was a limited partner

in Ascot during this time period, it had virtually the same performance as Ascot.

167.    No other skilled fund managers had a similar percentage of negative months over

the same period.  Managers who attempted to employ the SSC Strategy purportedly used by

BLMIS consistently failed to even approximate its results.

36

C.      **Impossibility: Trades Outside of the Daily Range**

168.    The Merkin Defendants received and reviewed trade confirmations and monthly

account statements.  These documents reflected execution prices outside the daily price range of

reported trades.

169.    Between 2000 and 2008, there were at least 323 transactions across the Defendant

Funds' accounts where equity prices were reported outside of the daily price range on the day the

trades were made.  These 323 transactions reflected nearly 33 million shares traded outside of the

daily price range.  BLMIS reported a transaction above the daily price range 180 times, and a

transaction below the daily price range 143 times.

170.    For example, the Defendant Funds' BLMIS account records reflected the

purchase of Intel Corporation (INTC) shares on October 2, 2003 at $27.63, with a settlement date

of October 7, 2003.  However, INTC's daily low on October 2, 2003 was $28.41.  Additionally,

the Defendant Funds' BLMIS accounts reflected the sale of JP Morgan (JPM) shares on

February 16, 2001 for $52.59, with a settlement date of February 22, 2001.  The daily high for

those JPM stocks was $52.00.

171.    Similarly, the Defendant Funds' December 2006 BLMIS account records reported

the sale of shares of Merck (MRK), each of which were purportedly executed at a price of

$44.61, with a December 22, 2006 trade date, and a December 28, 2006 settlement date.

However, the December 22, 2006 daily price for MRK shares ranged from a low of $42.78 to a

high of $43.42.  Thus, BLMIS reported a sale more than $1 above the December 22, 2006 high

for shares of MRK—a clear impossibility.

172.    In addition to the equity transactions, over the same 2000 through 2008 time

period, there were at least 59 options transactions that were traded outside of the daily price

ranges across the BLMIS accounts of the Defendant Funds.  In comparing the BLMIS data used

37

to generate customer records against historical price data from the Chicago Board Options

Exchange ("CBOE"), BLMIS reported 33 transactions traded above the daily high and 26

transactions traded below the daily low.

173.    In addition to the equity and option transactions, over the same 2000 through

2008 time period, BLMIS reported prices for U.S. Treasury bills that implied yields outside of

the yields reported by Bloomberg.  BLMIS reported over 1,000 trades of Treasury bills outside

the daily price range (plus/minus 1 basis point), and over 200 trades outside the daily price range

(plus/minus 10 basis points).

174.    Any one of these out-of-range equity, option, and Treasury trades were

impossible and demonstrate that BLMIS was not actually making the trades that were

represented on trade confirmations or customer statements provided to the Merkin Defendants.

The only possible explanation for so many falsely reported trades was fraud.

**D.    Impossibility:  Lack of Scalability**

175.    By 2000 through 2001, Merkin believed that BLMIS had at least $7 billion in

assets under management. As a sophisticated investment manager, Merkin knew that in the

financial markets, scalability is the ability of an investment strategy to handle higher trading

volumes or increased assets under management.  As assets under management increase, it

becomes more difficult for the fund to find opportunities of a scale proportional to the growing

size of the fund.

176.    Merkin has acknowledged the fundamental reality that no investment strategy is

infinitely scalable.  In Merkin's own words, "[t]he God of size comes to visit everybody."

177.    Madoff's SSC Strategy, which purportedly capitalized on inefficiencies in the

market, was limited because there were fewer opportunities for inefficiencies with the most

efficiently-traded and tracked stocks in the S&P 100 market and was further limited by the

available volume of stock in S&P 100 companies.

178.    The SSC Strategy was not scalable for a fund as large as the one Merkin thought

Madoff managed.  To execute the SSC Strategy with at least $7 billion of assets under

management, BLMIS would have needed approximately $7 billion in notional value in call

options.  Between 2000 and 2008, there were not enough options on the entire market to

implement Madoff's purported SSC Strategy at any point in time.  This impossibility was more

evident in 2006, 2007, and 2008, when BLMIS publicly disclosed through its Form ADV and

annual amendments filed with the SEC that it was managing approximately $11.7 billion as of

July 2006, $13.2 billion as of December 2006, and $17.1 billion as of December 2007,

respectively.  Merkin knew of these impossibilities.

**E.    Impossibility:  Option Volumes**

179.    On average, the Defendant Funds' BLMIS account records showed that they

owned more put and call options than existed for most of the calendar year on the CBOE.

Merkin received trade confirmations of the purported options contract purchases and sales for the

Defendant Funds.  The confirmation slips had Committee on Uniform Security Identification

Procedures ("CUSIP") numbers—numbers that uniquely identify a company, issuer, and type of

security—on them, indicating that they were traded on the CBOE, the largest exchange on which

such options are traded.  Option contracts purchased on the OTC market do not receive a CUSIP

number.

180.    Frequently, BLMIS reported more option trades than were available in the entire

exchange market.  As set forth in the following tables, from 2000 through 2008, the

overwhelming majority of the put and call options purportedly bought and sold by BLMIS for

the Merkin Funds' accounts were beyond the CBOE's daily volume.



**Merkin BLMIS Call Option Volume Relative to Corresponding Market Volume 2000-2008**



**Merkin BLMIS Put Option Volume Relative to Corresponding Market Volume 2000-2008**

181.    In addition, there were ten instances in which BLMIS purportedly executed

options trades for the Defendant Funds' accounts, but publicly available records show no volume

traded on that day.

182.    Besides the impossibility of executing trades for the Defendant Funds' accounts comprising more than the daily options trading volume for a particular contract, BLMIS purportedly had billions of dollars of other assets under management, separate from the Defendant Funds.  Merkin knew that there were at least five other investors who placed more money with BLMIS than he had.

183.    Merkin knew that the volume of put and call options purportedly bought and sold by BLMIS for the Defendant Funds' accounts that were beyond the daily volume of the CBOE were impossible and demonstrated that BLMIS was not actually making the trades that were represented on trade confirmations or customer statements provided to Merkin.

**F.    Impossibility:  Timing of Trades**

184.    BLMIS account records sent to the Defendant Funds reflected a consistent ability to trade stocks near their monthly highs and lows.  With remarkable consistency, when BLMIS was purportedly purchasing shares, the reported average purchase price was almost always in the lower half of the daily price range, and when selling shares, the sale price was almost always in the upper half of the daily price range.  Prices reflected on trade confirmations and account statements received by the Defendants demonstrated the implausibility of Madoff's ability to consistently get the best price.

185.    Upon information and belief, Madoff also represented to the Defendants that he was time-slicing (entering the market at specific intervals over the course of a trading day), and thus the reported price was an average.  In purchasing or selling a stock several times during the trading day, BLMIS's reported prices should have generally gravitated toward the daily midpoint.  Instead, they gravitated toward Madoff's optimal price point—a statistical impossibility.

186.    For example, the Defendant Funds' account statements and trade confirmations indicate that, from 1993 to 2008, approximately 77% of equity buys occurred in the lower half of the daily price range and approximately 71% of equity sells occurred in the upper half of the daily price range.

187.    The trade confirmations and monthly statements sent to the Defendants also identified equity trades that BLMIS purportedly purchased at or near the daily low or at or near the daily high but could not have occurred because of insufficient trading volume.

**G.    Indicia of Fraud:  Option Trades and CUSIP**

188.    The Defendant Funds' paper trade confirmations from BLMIS also contradicted Madoff's claims that, from time to time, BLMIS purchased options on the OTC market.

189.    All of the BLMIS options trade confirmations contained CUSIP identification numbers, which indicated that the options BLMIS utilized were S&P 100 Index options that were traded on the CBOE, not the OTC market.

190.    Indeed, even the option trade confirmations that were marked as OTC transactions still suspiciously contained a CUSIP number.

191.    Based on their review of the trade confirmations, the Defendants knew that BLMIS could not have been purchasing options on the OTC market.  However, Merkin continued to represent to certain investors that BLMIS was purchasing options on the OTC market.

192.    Moreover, trading OTC options would have required BLMIS to enter into private, individually negotiated contracts with willing counterparties.  Merkin knew that it would have been necessary for BLMIS to enter into options trades on behalf of the Defendant Funds in order to trade OTC options.  These option trades are private contracts between the Defendant Funds

and the counterparty. If the counterparty failed to perform, it was the Defendant Funds, not

BLMIS, who would be exposed to risk. Additionally, trade confirms would normally identify

the counterparty, but the ones that the Defendants received from BLMIS did not do so. Despite

this risk exposure, the Defendants took no steps to determine the identities of the counterparties

from Madoff or BLMIS.

**H.      Indicia of Fraud:  The Defendant Funds Had Negative Cash Balances at BLMIS**

193.     From at least December 1995 through December 2008, the reported cash available

in the Defendant Funds' BLMIS accounts had a negative cash balance on 356 separate occasions

for a total of approximately 1,139 days out of a possible 14,336 days. Certain of the negative

balances resulted from either the purported purchase of equities that exceeded the value of the

Treasurys sold to fund the purported purchase, the purported purchase of put options prior to

selling the call options they were meant to fund, or cash being withdrawn by the Defendants

prior to the sale of equities to fund the withdrawal. Normally, when a customer purchases assets

prior to the funds being available in the customer's account, the customer is buying on "margin."

194.     Indeed, there were dozens of instances where the Defendant Funds withdrew or

transferred cash from their accounts, resulting in a negative cash balance. For example, on

January 5, 2004, Ariel's BLMIS account transferred cash to Ascot's BLMIS account, which

resulted in a negative cash balance of $14,196,997.05 for Ariel. However, Ariel purportedly

purchased equities with a trade date of January 5, 2004 and a settlement date of January 8, 2004,

while its account had a negative cash balance. The account did not return to a positive cash

balance until January 12, 2004.

195.     Upon information and belief, the Defendant Funds did not have margin accounts

with BLMIS and could not have traded on margin. Yet, the Defendant Funds knew that BLMIS

would continue to allow them to theoretically purchase securities even though their accounts did

not have cash available to make such purchases.

196.     When buying on margin, customers incur and are generally charged margin

interest because buying on margin is effectively buying the underlying security with a loan from

the investment adviser/broker dealer.  On information and belief, BLMIS never charged the

Defendant Funds any margin interest for this extension of credit, effectively giving millions of

dollars to the Defendant Funds as an interest-free loan.

**I.      Indicia of Fraud:  Madoff's Unusual Fee Structure**

197.     Madoff used an unusual fee structure that, when compared to the fees charged by

most investment funds, including those charged by the Defendants, meant that Madoff

inexplicably walked away from hundreds of millions of dollars in fees that would normally be

expected.

198.     Fund managers typically charge two types of fees for managing a client's assets:

(i) management fees; and (ii) performance fees.  These fees compensate managers for managing

the portfolio.  The management fee is usually a fixed percentage of the assets under

management, while the performance fee is based on the profits that are realized, compensating

the manager for successful performance.  Fees to pay broker-dealers for trading securities, as

well as other expenses, are either charged for separately, or can be covered in management fees.

199.     Instead of charging a 1% to 2% management fee and a 10% to 20% performance

fee, which is typical of investment funds, BLMIS charged a commission for trades - $0.04 per

share on stock transactions, and $1.00 per option contract.  Assuming this fee structure, Merkin

would have paid to BLMIS an average of only $15.5 million in fees per year, totaling $124.2

million between 2001 and 2008.

200.    Merkin therefore knew that the Defendant Funds were paying, on average, $38 million less per year between 2001 and 2008 under BLMIS's existing fee structure than they would have paid under a typical 1-and-20 fee structure (*i.e.*, a 1% management fee and a 20% performance fee).  By not utilizing this 1-and-20 fee structure, Madoff knowingly passed on at least $305.2 million in fees from the Defendant Funds alone from 2001 through 2008. Aggregating these fees across BLMIS's reported assets under management, Merkin knew that Madoff was forgoing additional hundreds of millions of dollars in fees annually.

201.    Instead of questioning why Madoff would willingly forgo hundreds of millions of dollars in fees, Merkin accepted Madoff's representation that he made approximately 1.5% on the accounts he managed.  When Madoff attempted to explain why he did not take a 20% incentive fee, Merkin cut off Madoff's response and, according to a transcript prepared by the Defendants, replied "I know why you don't do it.  Because you're Bernie.  Because that's not the way the good Lord made you.  If he made you a little differently, you would."

202.    Madoff purported that BLMIS executed the SSC Strategy on all of the accounts managed, including the Defendant Funds' accounts.  It is highly inefficient for an investment adviser, following the same investment strategy for every account, to implement a fee structure that required an accounting of fees for each and every share and option contract.  It is simpler to apply a management and performance fee to each account and operate as a fund.

## J.    Indicia of Fraud:  Lack of Independent Custodian

203.    Merkin knew that BLMIS functioned as investment manager, administrator, and custodian of the securities purportedly owned on behalf of its customers, including the Defendant Funds.

204.     When an individual or institution entrusts funds to another entity (*e.g.,* an investment adviser) to manage, it is industry practice for an independent third-party custodian to hold the actual funds and/or securities.  Even though the investment adviser is deciding how best to invest the client funds, the funds and/or securities should be held by an independent, separate entity (*i.e.,* a custodian).

205.     The benefit of using a third-party custodian in these instances is clear – it acts as a check on the investment adviser.  The involvement of multiple parties in the management of assets helps reduce the potential for misappropriation of those assets by any of those parties.  It is extremely rare for investment advisers to also maintain custody of their clients' assets for this reason.  If there is a third-party custodian, client assets are safe even if the investment vehicle becomes insolvent.  If the investment adviser represents himself as the custodian, it is rife with the possibility of fraud, in that the adviser could theoretically misreport or misappropriate the assets, which is in fact what occurred with BLMIS.  Having third parties hold securities (*i.e.*, through the use of custodians) deters potential fraud.

206.     The lack of an independent custodian should have been a due diligence concern for the Defendants.  The exclusion of an independent custodian eliminated a safeguard against fraud because there is no independent verification that the transactions actually occurred, and further demonstrates the lack of transparency at BLMIS.

207.     Merkin knew that BLMIS was acting as an investment manager, administrator, and custodian for the Defendant Funds, but did nothing to protect the Defendant Funds investors' assets from fraud.  In fact, Merkin repeatedly assured his investors that he was protecting them against such fraud, stating in an April 19, 2002 newsletter to investors, "An exceptional run of superior performance in virtually any business is almost impossible to perpetuate . . . our job, as

we understand it, is to keep our guard up at all times." However, by acquiescing to and failing to

object to BLMIS unchecked control over all of the assets, the Defendants played an

indispensable role in allowing Madoff's scheme to grow and exist for as long as it did.

**K.    Indicia of Fraud:  Lack of Real-Time Electronic Access to Accounts and Trade
       Confirmations**

208.    Typical investment management industry operating procedures allow clients to

obtain account statements, balances, and other details through the Internet.  By at least June of

2000, the practice of granting clients electronic access to their accounts appeared to be

mainstream, particularly as a result of the Electronic Signatures in Global and National

Commerce Act, 15 U.S.C. § 7001, which permits the use of electronic records to satisfy

compliance with statutes and regulations.

209.    Throughout the 2000s, consumers were also conducting transactions and

accessing their checking and savings accounts through online access.

210.    Upon information and belief, Merkin knew and relied upon Madoff's reputation

in the media as a global leader in the use of technology, specifically, in publications including

*Securities Week, The New York Times*, and *Wall Street & Technology*.  Further, BLMIS's

marketing materials highlighted its abilities in this area, specifically stating:

> Moreover, Madoff Securities' computerized transaction processing
> means that the firm can customize client reports and deliver them
> electronically in whatever format best meets the needs of
> customers.

211.    Madoff himself highlighted to Merkin BLMIS's technological superiority, stating

that "we spend more on technology than any hedge fund I know of and more than 99% of the

brokerage industry does."

212.    The Defendants were never provided real-time access to any BLMIS account data or electronic statements up through December 11, 2008.

213.    The Defendant Funds' paper trade confirmations were occasionally received from BLMIS late and contained corrections that altered prior transactions.  These "corrective" trade confirmations received by Merkin indicated that a previous trade was done at a different price and that the corrective trade confirmation would replace the prior trade confirmation.

214.    The lack of real-time access to account data or electronic statements provided opportunities for fraud, particularly the manufacturing of fictitious trades, and the manipulation and/or adjustment of reported prices.

**L.      Indicia of Fraud:  Strip-Mall Auditors**

215.    The purpose of an auditor is to review the financial statements of the audited firm and determine their legitimacy in agreement with generally accepted accounting, corporate, and government policies and principles.  Merkin employed a well-known and reputable auditor—BDO Seidman—as the auditor for Gabriel and Ascot, and BDO Tortuga as the auditor for Ariel and the Former Ascot Fund.

216.    Auditors, consistent with industry custom and practice, act as a safeguard against fraud by providing independent verification of assets and financial transactions.

217.    The Defendants knew that BLMIS, purportedly the world's largest hedge fund with billions of dollars under management, was audited by Friehling & Horowitz, an accounting firm located in a strip mall in Rockland, New York, with three employees, one of whom was semi-retired.

218.    The Defendants did not question BLMIS's lack of a functional auditor, nor did they engage their own auditor, BDO Seidman, to audit BLMIS or provide independent verification of BLMIS's financial transactions.

## M.    Indicia of Fraud:  Industry Skepticism and Suspicion

219.    The Defendants ignored the warnings of industry professionals regarding Madoff and BLMIS.

220.    Victor Teicher, a long-time associate of Merkin and one-time money manager for Ariel and Gabriel, warned Merkin that the consistency of BLMIS's returns was not possible.

221.    Nash, a friend and colleague of Merkin and the trustee of his family's foundation, the "Nash Family Partnership," which invested in Gabriel, queried Merkin regarding Madoff's use of Friehling & Horowitz.  As noted, Nash conveyed to Merkin that BLMIS's failure to use a well-regarded accounting firm was a "potential red flag."

222.    The most significant industry warning came with the collapse of the Bayou Group in the fall of 2005, with even Merkin observing that the collapse will likely raise, as noted in ¶ 93 above, skepticism about Madoff and BLMIS's operations.  Shortly after the public disclosure of the Bayou Group's fraud, Merkin advised other fund managers that it would now be necessary to investigate investment managers for specific indicators of fraud, including:  (i) any investment that had a self-owned broker-dealer; (ii) any investment that had a questionable auditing firm; and (iii) any investment that had an unusual pricing or fee structure.  Merkin did not investigate these topics, took no additional due diligence steps, and made no additional inquiries into BLMIS's operations because he knew each of these three indicators of fraud clearly applied to BLMIS.

## THE MERKIN DEFENDANTS REAPED
## SIGNIFICANT MANAGEMENT AND INCENTIVE FEES

223.    Merkin funneled his investors' moneys to BLMIS, despite: (i) his actual knowledge of the fraud at BLMIS; and (ii) willful blindness to trading impossibilities and indicia of fraud, in order to reap significant management and incentive fees on the investments.

224.    Pursuant to Ariel's Investment Advisory Agreement with GCC and its Offering Memorandum, Ariel was to pay GCC, as Investment Advisor, a management fee equal to 1% of the beginning net asset value attributable to each series of shares and an incentive fee equal to 20% of the increase, if any, in the net asset value per share on the last business day of the year over the first business day of the year.

225.    Ariel paid GCC the management fee and the incentive fee on the last day of the fund's fiscal year, which was December 31st.

226.    From 2000 through February 2006, investors in Ariel could redeem all or part of their investments at the end of each calendar quarter upon 30 days' notice.  After February 2006 and through 2008, Ariel investors who invested prior to February 1, 2006 could continue to redeem their investments at the end of the calendar quarter upon 30 days' notice, but those investors who invested after February 1, 2006 could only redeem at the end of the calendar quarter after the two-year anniversary of their initial investment (the "First Redemption Date") and thereafter, on each anniversary of the First Redemption Date upon 30 days' notice.

227.    If an Ariel investor redeemed all or part of their investment prior to the end of the calendar year, GCC was entitled to a *pro rata* adjustment of the capital balance for calculation of the management and incentive fees.

228.    Under the terms of the Investment Advisory Agreement between GCC and Ariel, GCC was entitled to defer the payment of all or a portion of the fees payable to GCC.

229.    Pursuant to Gabriel's Confidential Offering Memoranda from 2000 through 2008, Gabriel was to pay Merkin, as its general partner, a management fee equal to 1% (prorated for periods of less than a year) of each limited partner's capital account balance at the beginning of such year plus such partner's contributed capital during such year.

230.    Merkin, as Gabriel's general partner, was also entitled to 20% of Gabriel's net income in excess of the management fee as an incentive fee.  The management fee and incentive fee was payable on the last day of the fund's fiscal year, which was December 31st.

231.    Class A Limited Partners of Gabriel could withdraw all or part of their capital account from Gabriel on June 30 or December 31 of any fiscal year upon 45 days' written notice.

232.    Class B Limited Partners of Gabriel, investors who invested on or after February 1, 2006, could withdraw all or part of their capital account at the end of the calendar quarter after the two year anniversary of their initial investments and thereafter on the anniversary of that date upon 45 days' notice.

233.    If a Gabriel investor redeemed all or part of his/her/its investment prior to the end of the calendar year, Merkin was entitled to a *pro rata* adjustment of the capital balance for calculation of the management and incentive fees.

234.    Pursuant to Ascot's Offering Memoranda from the funds' inception through 2002, Ascot was to pay Merkin a management fee equal to 1% (prorated for periods of less than a year) of each limited partner's capital account balance at the end of such year, as adjusted to take account of capital contributed or withdrawn during such year.

235.    As of January 1, 2003, Ascot increased its management fee to 1.5%.

236.    From the fund's inception, the Former Ascot Fund's management fee was payable to Ariel Management Corporation and then GCC.  Prior to January 1, 2003, the investment

advisory fee was equal to 1% (prorated for periods of less than a year) of the net asset value of each series of "participating shares" on the last day of each year. As of January 1, 2003, the Former Ascot Fund became a limited partner of Ascot, and its capital account balance was included in Ascot's management fee calculation.

237.    Merkin claimed in a letter to his investors that the increase in fees was due to the "expenses of running Ascot Partners over the past few years" and that the fees represented a "fair level of compensation for the risk that we take and the results that have been achieved." However, there was no increase in expenses to Merkin for running Ascot from 1999 to 2003 because Ascot and the Former Ascot Fund had at least 97.55% of their assets with BLMIS. Indeed, in 2003, Ascot had 100% of its assets with BLMIS.

238.    From 1992 to 2006, a limited partner of Ascot could withdraw all or part of its capital account on 45 days' notice on December 31st.

239.    From March 2006 through 2008, a Class A Limited Partner of Ascot could withdraw all or part of its capital account on 45 days' notice on December 31 of any year. Class B Limited Partners, which were investors in the Former Ascot Fund, could withdraw all or part of its capital account on 25 days' notice on the last business day of each March, June, September, and December of any fiscal year. A Class C Limited Partner of Ascot could withdraw all or part of its capital account at the end of the calendar quarter after the two-year anniversary of their initial investment and thereafter upon 45 days' notice of the anniversary of that date.

240.    If an Ascot investor redeemed all or part of his/her/its investment prior to the end of the calendar year, Merkin was entitled to a *pro rata* adjustment of the capital balance for calculation of the management fee.

241.    Upon information and belief, Merkin purposefully limited his investors' ability to withdraw funds from the Defendant Funds, in part, because he knew that Madoff needed to maintain capital to perpetuate his fraud.

242.    In fact, Ariel and Gabriel did not make any redemptions from BLMIS until 2008.

243.    Between May 1998 and November 2005, Ascot and the Former Ascot Fund made only two redemptions from their BLMIS accounts, totaling $17 million.  Yet, Ascot's investors alone requested redemptions in the amount of $641,518,888 from 2000 through 2005.  Merkin himself redeemed $9,650,900 from his Ascot capital account in 2000.

244.    From at least May 1998 to November 2005, the Defendant Funds used intra-account transfers to avoid having to redeem more than the $17 million described above from their BLMIS accounts.  The Defendant Funds transferred hundreds of millions of dollars between their respective BLMIS accounts and their respective Morgan Stanley accounts to pay investor redemptions related to their BLMIS investments.  These intra-account transfers were also used to fund management and incentive fee payments to Merkin and GCC during at least this time period.

245.    Upon information and belief, Merkin was aware in November 2005, and again in January 2006, that Madoff was dangerously close to not having enough liquidity to make requested redemptions.  As a result, starting in February 2006, Merkin required that new investors in Ariel and Gabriel stay invested in those respective funds for two years before being able to redeem.  Starting in March 2006, new investors in Ascot had to remain invested for two years before being able to redeem.

246.    In fact, in March 2006, Merkin apologized to Madoff for withdrawing $76 million from Ascot's BLMIS account.  Ascot had already withdrawn $25 million on December 23, 2005 and $63 million on January 6, 2006.

247.     The table below reflects the percentage of Ariel's and Gabriel's total assets

purportedly managed by BLMIS by year, as admitted by the Merkin Defendants:

| Year | Ariel | Gabriel |
|------|-------|---------|
| 1990 | 23.43% | 24.01% |
| 1991 | 17.89% | 13.17% |
| 1992 | 21.83% | 21.34% |
| 1993-1999 | 0% | 0% |
| 2000 | 7.96% | 7.13% |
| 2001 | 21.15% | 21.35% |
| 2002 | 29.18% | 30.32% |
| 2003 | 22.19% | 23.45% |
| 2004 | 20.86% | 19.54% |
| 2005 | 16.24% | 16.24% |
| 2006 | 23.35% | 23.76% |
| 2007 | 24.42% | 24.04% |

248.     The table below reflects the percentage of Ascot's and the Former Ascot Fund's

total assets purportedly managed by BLMIS, as admitted by the Merkin Defendants:

| Year | Ascot Partners | Ascot Fund |
|------|----------------|------------|
| 1992 |  | 101.08% |
| 1993 | 98.04% | 100.58% |
| 1994 | 99.87% | 101.01% |
| 1995 | 100.85% | 100.85% |
| 1996 | 91.62% | 94.70% |
| 1997 | 88.03% | 74.43% |
| 1998 | 91.03% | 83.11% |
| 1999 | 97.55% | 97.85% |
| 2000 | 100.04% | 100.25% |
| 2001 | 100.94% | 101.00% |
| 2002 | 100.01% | 100.94% |
| 2003 | 100.03% | N/A |
| 2004 | 94.39% | N/A |
| 2005 | 99.22% | N/A |
| 2006 | 99.36% | N/A |
| 2007 | 91.27% | N/A |

249.    As admitted by the Merkin Defendants, the Merkin Defendants received at least

$194,022,536 in management fees for Ascot and the Former Ascot Fund since their inception

through 2008.

250.    As admitted by the Merkin Defendants, the total incentive and management fees

that the Merkin Defendants were entitled to receive for Ariel from 2000 through 2007 were

$120,816,221, with an additional $6,934,086 in 2008, for a total of $127,750,307.

251.    Of the $120,816,221 in fees for Ariel from 2000 through 2007, $24,539,562 is

attributable to Ariel's investment with BLMIS.

252.    As admitted by the Merkin Defendants, the total incentive and management fees

that the Merkin Defendants were entitled to receive for Gabriel from 2000 to 2007 was

$180,241,610, with an additional $11,046,619 in 2008, for a total of $191,288,229.

253.    Of the $180,241,610 in fees for Gabriel from 2000 through 2007, $37,595,468 is

attributed to Gabriel's investment with BLMIS.

254.    By the time of Madoff's arrest, the Defendant Funds received at least $550

million in direct transfers of customer property from their BLMIS IA accounts.

255.    Upon information and belief, the Merkin Defendants received at least the

aforementioned management and incentive fees in connection with the execution of these

fraudulent transfers to the Defendant Funds.  These management and incentive fees are avoidable

and recoverable by the Trustee.

## COMMINGLING OF ASSETS BY AND BETWEEN
## MERKIN, GCC, AND THE DEFENDANT FUNDS

256.    Upon information and belief, and the Trustee's ongoing investigation, the Merkin Defendants improperly commingled the business assets of the Defendant Funds, which received transfers from BLMIS with Merkin's personal assets, the assets of GCC, and other business assets.  Merkin further improperly transferred moneys out of and into the respective Defendant Funds' BLMIS accounts, and improperly transferred the moneys out of and into the respective Defendant Funds' Morgan Stanley accounts.

257.    The commingling and manipulation of moneys in and between the Defendants' BLMIS and Morgan Stanley Accounts permitted Merkin to improperly use the collective assets of GCC and the Defendant Funds for his own personal and business purposes.

### A.      Improperly Commingled Assets at GCC

258.    The Defendants held several accounts at Morgan Stanley, which were held in the names of the Defendant Funds and GCC, and were ultimately controlled by Merkin.  One of these accounts, Morgan Stanley Account No.: xxxx021, was the main account that transacted business for GCC (the "Main Account").  The Main Account had no sub-accounts or segregated accounts.

259.    As set forth above and in Exhibit B, the Initial Transfers were made from BLMIS to or for the benefit of one or more of the Defendant Funds.

260.    Between June 1998 and February 2009, the Defendant Funds transferred moneys received directly and indirectly from BLMIS to the Main Account.  During this time, the Merkin Defendants also transferred management fees from the Defendant Funds, investor contributions and fees from third party entities, moneys from Merkin's personal accounts, and moneys from

unidentifiable sources into the Main Account.  All of these moneys were held, unsegregated, in the Main Account.

261.    Between June 1998 and February 2009, the Merkin Defendants transferred moneys from the single, commingled Main Account, including moneys received from BLMIS, to the Defendant Funds, to Merkin's personal bank account, to investors, and to unidentifiable third parties.

262.    In addition to these transfers, the Merkin Defendants also transferred at least $92 million from the single, commingled Main Account to several art galleries, including Pace Wildenstein, LLC, Sotheby's, C&M Arts, and L&R Entwistle, to purchase numerous paintings by Mark Rothko and other works of art.  The works of art, purchased by GCC, were held in the name of Ezra Merkin and/or Ezra and his wife, Lauren Merkin.

263.    The Merkin Defendants also transferred moneys from the single, commingled Main Account to the Internal Revenue Service for payment of taxes incurred by Merkin personally, Lauren Merkin, and for several trust entities benefitting Merkin and/or his family, including the Ezra Merkin 1992 Family Trust, the Ezra Merkin 2000 Trust, the Lauren Merkin 1992 Family Trust, and the Lauren Merkin 2000 Trust ("Merkin Family Trusts").

264.    Upon information and belief, at all times discussed herein, Merkin dominated, influenced, controlled, and was the sole decision-maker for the Merkin Family Trusts, their business, property, and affairs, and directed the transfers from the single, commingled Main Account.

265.    The Merkin Defendants also transferred moneys from the single, commingled Main Account to, or for the benefit of, several Merkin family partnerships, including but not

limited to, Hobby Farm Partners, LLC, Hobby Farm Partners, L.P., Jennyness Consulting, LLC, and Piping Brook, LLC (collectively, the "Merkin Family Partnerships").

266.    Upon information and belief, Merkin is a founder, principal, officer, director, shareholder, owner, managing member, and/or general partner of the Merkin Family Partnerships, and directed the transfers from the single commingled Main Account.

267.    Upon information and belief, in addition to the foregoing transfers, the Merkin Defendants also used the moneys in the single, commingled Main Account to: (i) pay investor redemptions and withdrawals with new funds deposited by other existing or new investors, and (ii) invest in margin accounts.

**B.      Transfers of Assets between the BLMIS Accounts of the Defendant Funds**

268.    Merkin directed inter-account transfers between the Defendant Funds' BLMIS accounts.  Specifically, the Defendants' books and records reflect transfers of moneys between the BLMIS accounts of the respective Defendant Funds of at least $361.4 million.

269.    Between 1993 and 2008, the Merkin Defendants transferred at least $65.5 million out of Ariel's BLMIS account to Ascot's BLMIS account.

270.    Between 1993 and 2008, the Merkin Defendants transferred at least $77.5 million out of Ascot's BLMIS account to Ariel's BLMIS account.

271.    Between 1993 and 2008, the Merkin Defendants transferred at least $140 million out of Ascot's BLMIS account to Gabriel's BLMIS account.

272.    Therefore, at least $217.5 million was transferred out of Ascot's BLMIS account to the other Defendant Funds.

273.    Between 1993 and 2008, the Merkin Defendants transferred at least $7 million out of the Former Ascot Fund's BLMIS account to Gabriel's BLMIS account.

274.    Between 1993 and 2008, the Merkin Defendants transferred at least $7 million out of the Former Ascot Fund's BLMIS account to Ariel's BLMIS account.

275.    Therefore, at least $14 million was transferred out of the Former Ascot Fund's BLMIS account to Ariel and Gabriel.

276.    Between 1993 and 2008, the Merkin Defendants transferred at least $64 million out of Gabriel's BLMIS account to Ascot's BLMIS account.

277.    Between 1993 and 2008, the Merkin Defendants transferred at least $400,000 out of Gabriel's BLMIS account to the Former Ascot Fund's BLMIS account.

278.    Therefore, at least $64.4 million was transferred out of Gabriel's BLMIS account to the other Defendant Funds.

279.    Upon information and belief, the Merkin Defendants received or claim entitlement to fees from the Defendant Funds based on the transfers of moneys out of each of the respective BLMIS accounts.  The Trustee seeks return of these fees.

280.    There were no loan documents made by or between the Defendant Funds concerning these inter-BLMIS account transfers.  There are no documents by or between the Defendant Funds modifying investor interest in the respective Defendant Funds resulting from these inter-BLMIS account transfers.

**C.      Transfer of Assets Between the Morgan Stanley Accounts of the Defendant Funds**

281.    Upon information and belief, Merkin directed inter-account transfers between the Morgan Stanley bank accounts of the Defendant Funds.  Specifically, the Defendants' books and records reflect transfers of moneys between the Morgan Stanley accounts of the respective Defendant Funds of at least $995 million.

282.    Between 1998 and 2009, the Merkin Defendants transferred at least $59 million out of Ascot's Morgan Stanley account to Ariel's Morgan Stanley account.

283.    Between 1998 and 2009, the Merkin Defendants transferred at least $125 million out of Ascot's Morgan Stanley account to Gabriel's Morgan Stanley account.

284.    Therefore, at least $184 million was transferred out of Ascot's Morgan Stanley account to the other Defendant Funds.

285.    Between 1998 and 2009, the Merkin Defendants transferred at least $335 million out of Ariel's Morgan Stanley account to Gabriel's Morgan Stanley account.

286.    Between 1998 and 2009, the Merkin Defendants transferred at least $76 million out of Ariel's Morgan Stanley account to Ascot's Morgan Stanley account.

287.    Therefore, at least $411 million was transferred out of Ariel's Morgan Stanley account to the other Defendant Funds.

288.    Between 1998 and 2009, the Merkin Defendants transferred at least $209 million out of Gabriel's Morgan Stanley account to Ariel's Morgan Stanley account.

289.    Between 1998 and 2009, the Merkin Defendants transferred at least $191 million out of Gabriel's Morgan Stanley account to Ascot Partners' Morgan Stanley account.

290.    Therefore, at least $400 million was transferred out of Gabriel's Morgan Stanley account to the other Defendant Funds.

291.    There were no loan documents made by or between the Defendant Funds concerning these inter-Morgan Stanley account transfers.  There are no documents by or between the Defendant Funds modifying investors' interests in the respective Defendant Funds resulting from the inter-Morgan Stanley account transfers.

## IMPUTATION AND GENERAL PARTNER LIABILITY

292.    Under the circumstances set forth herein, Merkin had actual knowledge of and/or was willfully blind to impossibilities in the trading allegedly performed by BLMIS and indicia of fraud at BLMIS.

### A.    Imputation as to GCC

293.    At all times herein discussed, Merkin dominated, influenced, and controlled GCC and its business, property, and affairs.

294.    Merkin was the sole decision-maker for GCC and actively directed and controlled the daily activities of GCC, including its dealings with Madoff and BLMIS.  As such, Merkin's actual knowledge of and willful blindness to impossibilities and indicia of fraud at BLMIS are imputed to GCC.

295.    Upon information and belief, Merkin commingled the business assets of GCC with his personal assets, assets of the Defendant Funds, and other business assets, and used the collective assets held by GCC for his own personal purposes.  GCC functioned as the alter ego of Merkin and was the mere instrumentality of Merkin.

296.    As GCC was the alter ego of Merkin, his actual knowledge of and willful blindness to impossibilities and indicia of fraud at BLMIS are imputed to GCC.

297.    As the agent and sole decision-maker of GCC, Merkin's actual knowledge of and willful blindness to impossibilities in the trading allegedly performed by BLMIS and indicia of fraud at BLMIS are imputed to GCC.

B.    **Imputation as to Ariel**

298.    Upon information and belief, all business decisions for Ariel, including those related to investments with BLMIS, were made by Merkin in the ordinary course of Ariel's business.

299.    At all times herein discussed, Merkin dominated, influenced, and controlled Ariel and its business, property, and affairs.  Merkin was the sole decision-maker for Ariel and actively directed and controlled the daily activities of Ariel, including its dealing with Madoff and BLMIS, which he knew was a fraud or had facts suggesting a high probability that BLMIS was a fraud.

300.    As the agent of Ariel, Merkin's actual knowledge of and willful blindness to impossibilities in the trading allegedly performed by BLMIS and indicia of fraud at BLMIS are imputed to Ariel.

301.    As the agent and sole decision-maker for Ariel, Merkin's actual knowledge of and willful blindness to impossibilities in the trading allegedly performed by BLMIS and indicia of fraud at BLMIS are imputed to Ariel.

C.    **Imputation as to Gabriel**

302.    Upon information and belief, all business decisions for Gabriel, including those related to investments with BLMIS, were made by Merkin in the ordinary course of Gabriel's business.

303.    At all times herein discussed, Merkin dominated, influenced, and controlled Gabriel and its business, property, and affairs.  Merkin was the sole decision-maker for Gabriel and actively directed and controlled the daily activities of Gabriel, including its dealing with

Madoff and BLMIS, which he knew was a fraud or had facts suggesting a high probability that BLMIS was a fraud.

304.    As the agent and the general partner of Gabriel, Merkin's actual knowledge of and willful blindness to impossibilities in the trading allegedly performed by BLMIS and indicia of fraud at BLMIS are imputed to Gabriel.

**D.      Imputation as to Ascot**

305.    Upon information and belief, all business decisions for Ascot, including those related to investments with BLMIS, were made by Merkin in the ordinary course of Ascot's business.

306.    At all times herein discussed, Merkin dominated, influenced, and controlled Ascot and its business, property, and affairs.  Merkin was the sole decision-maker for Ascot and actively directed and controlled the daily activities of Ascot, including its dealing with BLMIS, which he knew was a fraud or had facts suggesting a high probability that BLMIS was a fraud.

307.    As the agent and the general partner of Ascot, Merkin's actual knowledge of and willful blindness to impossibilities in the trading allegedly performed by BLMIS and indicia of fraud at BLMIS are imputed to Ascot.

**E.      Imputation as to the Former Ascot Fund**

308.    Upon information and belief, all business decisions for the Former Ascot Fund, including those related to investments with BLMIS, were made by Merkin in the ordinary course of the Former Ascot Fund's business.

309.    At all times herein discussed, Merkin dominated, influenced, and controlled the Former Ascot Fund and its business, property, and affairs.  Merkin was the sole decision-maker for the Former Ascot Fund and actively directed and controlled the daily activities of the Former

Ascot Fund, including its dealing with Madoff and BLMIS, which he knew was a fraud or had facts suggesting a high probability that BLMIS was a fraud.

310.    As the agent of the Former Ascot Fund, Merkin's actual knowledge of and willful blindness to impossibilities in the trading allegedly performed by BLMIS and indicia of fraud at BLMIS are imputed to the Former Ascot Fund.

**F.    General Partner Liability for Ascot and Gabriel**

311.    As to Ascot, Merkin was the sole general partner and had ultimate responsibility for the operation and management of the partnership, including the authority to make investment decisions, admit new partners, and withdraw his own capital or terminate the partnership.

312.    As to Gabriel, Merkin was the sole general partner and had ultimate responsibility for the operation and management of the partnership, including the authority to make investment decisions, admit new partners, and withdraw his own capital or terminate the partnership.

313.    Under Section 23 of New York Partnership Law, Merkin is personally liable as a matter of state law for the debts and obligations of the partnership, including the preferential and fraudulent transfers received by Ascot and Gabriel, as set forth herein.

314.    In the event that Gabriel is unable to satisfy any judgment against it, any judgment against Gabriel to recover BLMIS transfers can be enforced against Merkin individually.

315.    Ascot was rendered insolvent because of its investment with BLMIS.  Thus, any judgment against Ascot to recover BLMIS transfers can be enforced against Merkin individually.

## THE INITIAL AND SUBSEQUENT TRANSFERS TO THE
## DEFENDANTS ARE AVOIDABLE AND RECOVERABLE BY THE TRUSTEE

316.    The Initial and Subsequent Transfers are avoidable, recoverable, and should be preserved for the benefit of the estate under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, including 15 U.S.C. § 78fff-2(c)(3), applicable provisions of N.Y. CPLR 203(g) and 213(8) (McKinney 2001), and N.Y. Debt. & Cred. Law §§ 273–279 (McKinney 2001).

317.    Of the Initial Transfers, at least eleven transfers in the collective amount of $494,600,000 (the "Six Year Transfers") were made to the Defendant Funds during the six years prior to the Filing Date and are avoidable and recoverable under sections 544 and 550(a)(1) of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. Debt. & Cred. Law §§ 273–279.

318.    Of the Six Year Transfers, at least six transfers in the collective amount of $313,600,000 (the "Two Year Transfers") were made to the Defendant Funds during the two years prior to the Filing Date, and are additionally avoidable and recoverable under sections 548(a)(1) and 550(a)(1) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

319.    Of the Two Year Transfers, one to Ascot in the amount of $45,000,000 (the "90 Day Transfer") was made during the 90 days prior to the Filing Date, and is additionally avoidable and recoverable under sections 547 and 550(a)(1) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).  As previously defined, the Six Year Transfers, Two Year Transfers, and 90 Day Transfers are collectively referred to herein as the "Initial Transfers."

320.    To the extent that any of the recovery counts may be inconsistent with each other,

they are to be treated as being pleaded in the alternative.

321.    The Trustee's discovery and investigation is ongoing and the Trustee reserves the

right to: (i) supplement the information on the Initial Transfers, the Subsequent Transfers, and

any additional transfers; and (ii) seek avoidance and recovery of such transfers.

**COUNT ONE**

**PREFERENTIAL TRANSFER – 11 U.S.C. §§ 105(a), 502(d), 547(b), 550, AND 551**

322.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Third Amended Complaint as if fully rewritten herein.

323.    At the time of the 90 Day Transfer, Ascot was a "creditor" of BLMIS within the

meaning of section 101(10) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

324.    The 90 Day Transfer constitutes a transfer of an interest of BLMIS in property

within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C.

§ 78fff-2(c)(3).

325.    The 90 Day Transfer was to or for the benefit of Ascot.

326.    The 90 Day Transfer was made for or on account of an antecedent debt owed by

BLMIS before such transfer was made.

327.    The 90 Day Transfer was made while BLMIS was insolvent.

328.    The 90 Day Transfer was made during the preference period under section

547(b)(4) of the Bankruptcy Code.

329.    The 90 Day Transfer enabled Ascot to receive more than Ascot would receive if:

(a) this case was a case under chapter 7 of the Bankruptcy Code; (b) the transfer had not been

made; and (c) Ascot received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

330.    The 90 Day Transfer constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from Ascot pursuant to section 550(a).

331.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 105(a), 502(d), 547(b), 550, and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the 90 Day Transfer; (b) directing that the 90 Day Transfer be set aside;  (c) recovering the 90 Day Transfer, or the value thereof, for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the 90 Day Transfer from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may have against the Debtors until such time as the 90 Day Transfer is repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate.

## COUNT TWO

## FRAUDULENT TRANSFERS – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551

332.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

333.    The Two Year Transfers were made on or within two years before the Filing Date.

334.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and 15 U.S.C. § 78fff-2(c)(3).

335.    The Two Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Two Year Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

336.    The Two Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a) of the Bankruptcy Code.

337.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Two Year Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may have against the Debtors until such time as the Two Year Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate.

## COUNT THREE

**FRAUDULENT TRANSFERS – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), AND 551**

338.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

339.    The Two Year Transfers were made on or within two years before the Filing Date.

340.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and 15 U.S.C. § 78fff-2(c)(3).

341.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

342.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers.

343.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

344.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

345.    The Two Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a) of the Bankruptcy Code.

346.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a

judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year

Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from the

Defendants for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent

allowable by law, to return to the Trustee all profits, including any and all management fees,

incentive fees or other compensation and/or remuneration received by the Defendants related to

or arising from, or concerning the Two Year Transfers from BLMIS to the Defendants; (e)

disallowing any claim that the Defendants may have against the Debtors until such time as the

Two Year Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from the

Defendants; and (g) awarding any other relief the Court deems appropriate.

## COUNT FOUR

### FRAUDULENT TRANSFERS – N.Y. DEBT. & CRED. LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

347.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Third Amended Complaint as if fully rewritten herein.

348.    At all times relevant to the Six Year Transfers, there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of

the Bankruptcy Code.

349.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under section 270 of the N.Y. Debt. & Cred. Law.

350.    Each of the Six Year Transfers was made by BLMIS with the actual intent to

hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for

the benefit of the Defendants in furtherance of a fraudulent investment scheme.

71

351.    Each of the Six Year Transfers was received by the Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six Year Transfers, and/or future creditors of BLMIS.

352.    As a result of the foregoing, pursuant to sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;  (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six Year Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate.

## COUNT FIVE

### FRAUDULENT TRANSFERS – N.Y. DEBT. & CRED. LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550, AND 551

353.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

354.    At all times relevant to the Six Year Transfers there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

355.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under section 270 of the N.Y. Debt. & Cred. Law.

356.    BLMIS did not receive fair consideration for the Six Year Transfers.

357.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

358.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278, and/or 279 of the N.Y. Debt. & Cred. Law, and sections 105(a), 502(d), 544(b), 550, and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six Year Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate.

## COUNT SIX

### FRAUDULENT TRANSFERS – N.Y. DEBT. & CRED. LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

359.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

360.     At all times relevant to the Six Year Transfers there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

361.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under section 270 of the N.Y. Debt. & Cred. Law.

362.     BLMIS did not receive fair consideration for the Six Year Transfers.

363.     At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

364.     As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the N.Y. Debt. & Cred. Law, and sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six Year Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants

may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee;

(f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief

the Court deems appropriate.

## COUNT SEVEN

### FRAUDULENT TRANSFERS – N.Y. DEBT. & CRED. LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

365.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Third Amended Complaint as if fully rewritten herein.

366.    At all times relevant to the Six Year Transfers there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable

under section 502 of the Bankruptcy Code, or that are not allowable only under section 502(e) of

the Bankruptcy Code.

367.    Each of the Six Transfers constituted a conveyance by BLMIS as defined under

section 270 of the N.Y. Debt. & Cred. Law.

368.    BLMIS did not receive fair consideration for the Six Year Transfers.

369.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its ability to pay them as the

debts matured.

370.    As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the N.Y.

Debt. & Cred. Law and sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code

and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving

the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the

Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of

BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all

profits, including any and all management fees, incentive fees or other compensation and/or

remuneration received by the Defendants related to or arising from, or concerning the Six Year

Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may

have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (f)

recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the

Court deems appropriate.

## COUNT EIGHT

### UNDISCOVERED FRAUDULENT TRANSFERS – N.Y. C.P.L.R. 203(g) AND 213(8) AND N.Y. DEBT. & CRED. LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

371.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Third Amended Complaint as if fully rewritten herein.

372.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by

BLMIS was not reasonably discoverable by at least one unsecured customer of BLMIS, who

holds matured or unmatured unsecured claims against BLMIS that are allowable under section

502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the

Bankruptcy Code.

373.    At all times relevant to the Initial Transfers, there have been one or more creditors

holding matured or unmatured unsecured claims against BLMIS that are allowable under section

502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the

Bankruptcy Code.

374.    Each of the Initial Transfers constituted a conveyance by BLMIS as defined under

section 270 of the N.Y. Debt. & Cred. Law.

375.    Each of the Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Initial Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

376.    Each of the Initial Transfers was received by the Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Initial Transfers, and/or future creditors of BLMIS.

377.    As a result of the foregoing, pursuant to N.Y. C.P.L.R. 203(g) and 213(8), sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Initial Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may have against the Debtors until such time as the Initial Transfers are repaid to the Trustee;  (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate.

## COUNT NINE

### RECOVERY OF SUBSEQUENT TRANSFERS – N.Y. DEBT. & CRED. LAW §§ 276-a AND 278, AND 11 U.S.C. §§ 105(a), AND 550(a)

378.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

379.    Each of the Subsequent Transfers from the Defendant Funds is avoidable under sections 544, 547, and/or 548 and recoverable under section 550(a) of the Bankruptcy Code.

380.    Each of the Subsequent Transfers was made directly or indirectly to Merkin, GCC, Ascot, Former Ascot Fund, Ariel and/or Gabriel.

381.    Merkin, GCC, Ascot, Former Ascot Fund, Ariel and/or Gabriel are immediate or mediate transferees of the Subsequent Transfers from the Defendant Funds.

382.    Each of the Subsequent Transfers was received by Merkin, GCC, Ascot, Former Ascot Fund, Ariel and/or Gabriel with actual knowledge and/or willful blindness of BLMIS's fraudulent scheme at the time of each of the Subsequent Transfers.

383.    As a result of the foregoing, pursuant to sections 276-a and 278 of the N.Y. Debt. & Cred. Law, section 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Merkin, GCC, Ascot, Former Ascot Fund, Ariel and/or Gabriel: (a) recovering the Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (b) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Subsequent Transfers; (c) recovering attorneys' fees and costs from the Defendants; and (d) awarding any other relief, including attorneys' fees and costs, the Court deems appropriate.

78

## COUNT TEN

### GENERAL PARTNER LIABILITY

384.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

385.    At all times relevant to the Initial Transfers to Ascot and Gabriel, Merkin was the sole general partner of both funds.

386.    Ascot is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.  Merkin, as the general partner, is liable to satisfy any judgment against Ascot.

387.    In the event that Gabriel is unable to satisfy any judgment against it, Merkin, as the general partner, is liable to satisfy any judgment against Gabriel.

388.    As a result of the foregoing, pursuant to applicable state law, Merkin is jointly and severally liable for all debts and obligations of Ascot and Gabriel, and the Trustee is entitled to a judgment against Merkin recovering the Initial Transfers to Ascot and Gabriel or their value from Merkin for the benefit of the estate of BLMIS.

## COUNT ELEVEN

## OBJECTION TO AND DISALLOWANCE OF CLAIMS

389.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

390.    The Defendant Funds were not innocent investors at the time they invested with BLMIS.  As a result of their inequitable conduct, they are not entitled to restitution of their principal investment.

391.    The Defendant Funds acted with actual knowledge of fraudulent activity at BLMIS at the time the Defendant Funds invested with BLMIS.  By the Defendant Funds' conduct, at the time they invested with BLMIS, they enabled Madoff to perpetuate the fraud at BLMIS.

392.    Alternatively, the Defendant Funds acted with explicit awareness of numerous and serious indications of fraudulent activity at BLMIS, as described in this Third Amended Complaint.

393.    By the Defendant Funds' conduct, they cannot assert that they justifiably relied on the fact that BLMIS was a legitimate business.  Thus, the Defendant Funds do not have a claim for restitution or any other valid claim against the BLMIS estate.

394.    As a result of the foregoing conduct by the Defendants, as described above, by this action, the Trustee objects to any and all claims of the Defendant Funds against the BLMIS estate pursuant to section 502(a) of the Bankruptcy Code, which should be disallowed pursuant to second 502(b)(1) of the Bankruptcy Code, sections 78fff(b) and 78fff-1(a) of SIPA, and Federal Rule of Bankruptcy Procedure 3007(b), and not entitled to receive any equitable distribution from the estate.

## COUNT TWELVE

### EQUITABLE DISALLOWANCE OF CLAIMS

395.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

396.    The Defendants engaged in and benefited from inequitable conduct and with actual knowledge of fraudulent activity at BLMIS including the conduct described in this Third Amended Complaint.  By the Defendants' conduct, they have taken unconscionable advantage of, resulting in injury to, innocent customers and other creditors of the estate.

397.    Based upon the Defendants' failure to deal fairly and in good faith, as described above, all customers and other creditors of BLMIS have been injured, including by being (a) misled as to the true financial condition of the debtor; (b) induced to invest with BLMIS without knowledge of BLMIS's financial condition; and (c) hindered and delayed in recovering the full amounts due to them.  The Defendants' conduct further enabled Madoff to continue the Ponzi scheme.

398.    The Defendants' conduct was so egregious that they should not be allowed to share in any equitable distribution made by the Trustee to innocent customers holding allowed claims against BLMIS and/or Madoff.

399.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the Defendant Funds against the estate, are disallowed.

400.    Equitable disallowance is consistent with the provisions and purposes of the Bankruptcy Code.

401.    As a result of the foregoing, pursuant to this Court's equitable power, the Court should disallow each and every claim that the Defendant Funds assert against the Debtors' estate, all of which claims have no lawful existence under principles of restitution and other applicable state law.

## COUNT THIRTEEN

### EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS

402.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

403.    The Defendants engaged in inequitable conduct, including the conduct described in this Third Amended Complaint, and benefited by the withdrawal of at least $550 million, prior to the Filing Date.

404.    Based on the Defendants' inequitable conduct, BLMIS's customers have been misled as to the true financial condition of BLMIS and have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts clue to them.

405.    The Defendants' conduct enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on the Defendants.

406.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the Defendant Funds, directly or indirectly against the estate, and only to the extent such claims are allowed, are subordinated for distribution purposes pursuant to sections 510(c) and 105(a) of the Bankruptcy Code to the allowed claims of all other customers and creditors of BLMIS.

407.    Equitable subordination, as requested herein, is consistent with the provisions and purposes of the Bankruptcy Code.

408.    As a result of the foregoing, the Court should subordinate all claims of the Defendant Funds for purposes of distribution to all allowed claims of BLMIS's customers and creditors due to the Defendants' inequitable conduct pursuant to 105(a) and 510(c) of the Bankruptcy Code, such that no claim of the Defendant Funds is paid ahead of the allowed claim of any customer or creditor of the BLMIS estate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

i.    On the First Claim for Relief, judgment pursuant to sections 105(a), 502(d), 547(b), 550, and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the 90 Day Transfer; (b) directing that the 90 Day Transfer be set aside;  (c) recovering the 90 Day Transfer, or the value thereof, for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the 90 Day Transfer from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may have against the Debtors until such time as the 90 Day Transfer is repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate;

ii.      On the Second Claim for Relief, pursuant to sections 105(a), 502(d),

548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment:

(a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers

be set aside; (c) recovering the Two Year Transfers, or the value thereof, from the Defendants for

the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law,

to return to the Trustee all profits, including any and all management fees, incentive fees or other

compensation and/or remuneration received by the Defendants related to or arising from, or

concerning the Two Year Transfers from BLMIS to the Defendants; (e) disallowing any claim

that the Defendants may have against the Debtors until such time as the Two Year Transfers are

repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g)

awarding any other relief the Court deems appropriate;

iii.      On the Third Claim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(B),

550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding

and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside;

(c) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit

of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to

the Trustee all profits, including any and all management fees, incentive fees or other

compensation and/or remuneration received by the Defendants related to or arising from, or

concerning the Two Year Transfers from BLMIS to the Defendants; (e) disallowing any claim

that the Defendants may have against the Debtors until such time as the Two Year Transfers are

repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g)

awarding any other relief the Court deems appropriate;

iv.      On the Fourth Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;  (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six Year Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate;

v.      On the Fifth Claim for Relief, pursuant to sections 273, 278, and/or 279 of the N.Y. Debt. & Cred. Law, and sections 105(a), 502(d),544(b), 550, and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Six Year Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate;

85

vi.       On the Sixth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the

N.Y. Debt. & Cred. Law, and sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy

Code, and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six Year

Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year

Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d)

directing the Defendants, to the extent allowable by law, to return to the Trustee all profits,

including any and all management fees, incentive fees or other compensation and/or

remuneration received by the Defendants related to or arising from, or concerning the Six Year

Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may

have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee;  (f)

recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the

Court deems appropriate;

vii.      On the Seventh Claim for Relief, pursuant to sections 275, 278, and/or 279 of the

N.Y. Debt. & Cred. Law and sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy

Code and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six Year

Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year

Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d)

directing the Defendants, to the extent allowable by law, to return to the Trustee all profits,

including any and all management fees, incentive fees or other compensation and/or

remuneration received by the Defendants related to or arising from, or concerning the Six Year

Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may

have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee;  (f)

recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate;

viii.    On the Eighth Claim for Relief, pursuant to NY CPLR 203(g) and 213(8), sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (d) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Initial Transfers from BLMIS to the Defendants; (e) disallowing any claim that the Defendants may have against the Debtors until such time as the Initial Transfers are repaid to the Trustee;  (f) recovering attorneys' fees and costs from the Defendants; and (g) awarding any other relief the Court deems appropriate;

ix.    On the Ninth Claim for Relief, pursuant to sections 276-a and 278 of the N.Y. Debt. & Cred. Law, section 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment against Merkin, GCC, Ascot, Former Ascot Fund, Ariel and/or Gabriel: (a) recovering the Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; (b) directing the Defendants, to the extent allowable by law, to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Defendants related to or arising from, or concerning the Subsequent Transfers; (c) recovering attorneys' fees and costs from the Defendants; and (d) awarding any other relief, including attorneys' fees and costs, the Court deems appropriate;

x.      On the Tenth Claim for Relief, pursuant to applicable state law, judgment that Merkin is jointly and severally liable for all debts and obligations of Ascot and Gabriel, and recovering the Initial Transfers to Ascot and Gabriel or their value from Merkin for the benefit of the estate of BLMIS;

xi.      On the First through Tenth Claims for Relief, to the extent allowable by law, directing the Merkin Defendants to return to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Merkin Defendants related to, arising out of, or concerning the Initial Transfers, the Subsequent Transfers, and the Defendant Funds' BLMIS accounts;

xii.      On all Claims for Relief for which Ascot and Gabriel is liable, that the Court enter judgment for that same relief against Merkin as general partner of Ascot and general partner of Gabriel;

xiii.      On all Claims for Relief, imputing Merkin's knowledge to the Defendants;

xiv.      On all Claims for Relief, establishing a constructive trust over all Transfers and their proceeds, product and offspring in favor of the Trustee for the benefit of the estate;

xv.      On all Claims for Relief, pursuant to federal common law and/or N.Y. CPLR 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Initial Transfers were received;

xvi.      On all Claims for Relief, awarding the Trustee's attorneys' fees, all applicable interest, costs and disbursements incurred in this proceeding; and

xvii.    Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.


Dated: New York, New York                           *s/David J. Sheehan*
        August 30, 2013                          Baker & Hostetler LLP
                                         45 Rockefeller Plaza
                                         New York, New York 10111
                                         Telephone: (212) 589-4200
                                         Facsimile: (212) 589-4201
                                         David J. Sheehan
                                         Email: dsheehan@bakerlaw.com
                                         Lan Hoang
                                         Email: lhoang@bakerlaw.com
                                       Edward J. Jacobs
                                         Email: ejacobs@bakerlaw.com
                                         Brian W. Song
                                         Email: bsong@bakerlaw.com
                                         Sarah Jane T.C. Truong
                                         Email: struong@bakerlaw.com

                                         *Attorneys for Irving H. Picard, Trustee for the*
                                         *Substantively Consolidated SIPA Liquidation*
                                         *of Bernard L. Madoff Investment Securities*
                                         *LLC and the estate of Bernard L. Madoff*