UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : | Adv. P. No. 08-01789 (SMB) |
| | : | |
| Plaintiff, | : | SIPA LIQUIDATION |
| | : | |
| – against – | : | (Substantively Consolidated) |
| | : | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : | |
| | : | |
| Defendant. | : | |

------------------------------------------------------------X

| | |
|---|---|
| In re: | : |
| | : |
| BERNARD L. MADOFF, | : |
| | : |
| Debtor. | : |

------------------------------------------------------------X

| | | |
|---|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Adv. Pro. No. 09-01182 (SMB) |
| – against – | : | |
| | : | |
| J. EZRA MERKIN, *et al.,* | : | |
| | : | |
| Defendants. | : |

------------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

    David J. Sheehan, Esq.
    Lan Hoang, Esq.
    Seanna R. Brown, Esq.

Brian W. Song, Esq.
> Of Counsel

*Attorneys for Irving H. Picard, Trustee for*
*the Liquidation of Bernard L. Madoff*
*Investment Securities LLC*

DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036

Andrew J. Levander, Esq.
Neil A. Steiner, Esq.
Daphne T. Ha, Esq.
Mariel R. Bronen, Esq.
> Of Counsel

*Attorneys for J. Ezra Merkin and*
*Gabriel Capital Corporation*

NORTON ROSE FULBRIGHT US LLP
666 Fifth Avenue
New York, NY 10103

Judith A. Archer, Esq.
Jami Mills Vibbert, Esq.
Melanie Kotler, Esq.
David B. Schwartz, Esq.
> Of Counsel

*Attorneys for Ralph C. Dawson, as Receiver*
*for Ascot Partners, L.P. and Ascot Fund Ltd.*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa *et seq.* ("SIPA"), commenced this adversary proceeding to avoid and

recover transfers by BLMIS to certain initial and subsequent transferees.  Following the

disposition of motions to dismiss, *see Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117

(Bankr. S.D.N.Y. 2014) ("*Dismissal Decision*") and settlements by two defendants, only a few claims remain.

Currently before the Court are motions for summary judgment (the "Motions") by defendants (i) J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC," and together with Merkin, the "Merkin Defendants") and (ii) Ralph C. Dawson, as receiver for Ascot Partners, L.P. ("Ascot Partners") and Ascot Fund Ltd. ("Ascot Fund," and together with Ascot Partners, the "Ascot Entities," and collectively with the Merkin Defendants, the "Defendants"). For the reasons that follow, Ascot Partners is entitled to summary judgment dismissing Count Nine, but the Motions are otherwise denied.

## BACKGROUND

The essential facts regarding Bernard Madoff's Ponzi scheme have been recounted in numerous decisions of the Second Circuit, the District Court and this Court, including the *Dismissal Decision*. Beginning in the early 1990s[1], Madoff implemented his split-strike conversion strategy under which he purported to purchase a basket of stocks in the S&P 100 Index and sell call options and buy put options on the index ("SSC Strategy"). In fact, he did not engage in any trading, and instead, conducted a massive Ponzi scheme. He was arrested on December 11, 2008 (the "Filing Date") for criminal violations of federal securities laws, the Securities and Exchange Commission ("SEC") commenced a fraud action against Madoff and BLMIS, the Securities Investor

---

[1]     The start date and the scope of Madoff's Ponzi scheme are not in dispute for purposes of the Motions. However, the Trustee and defendants in other adversary proceedings have disputed these factual issues. (*See Order Authorizing the Deposition of Bernard L. Madoff*, dated Sept. 29, 2016 (authorizing deposition of Madoff on issues related to, *inter alia*, commencement date and scope of fraud) (ECF Adv. P. No. 08-01789 Doc. # 14213).) Nothing said in this opinion reflects a finding on those issues.

Protection Corporation ("SIPC") filed an application in the District Court seeking the protections afforded by SIPA for BLMIS' customers, and the District Court granted SIPC's application, appointed the Trustee to liquidate BLMIS, and removed the SIPA liquidation to this Court. Madoff pleaded guilty on March 12, 2009 to an eleven count criminal information at which time he admitted that he operated a Ponzi scheme through the investment advisory side of BLMIS, and was sentenced to a prison term of 150 years. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and a consent order substantively consolidating Madoff's estate and the BLMIS estate was entered by the Court on June 9, 2009.

The Trustee commenced this adversary proceeding on May 7, 2009, and filed his *Third Amended Complaint*, dated Aug. 30, 2013 ("*TAC*") (ECF Doc. # 151)[2] against the Merkin Defendants, the Ascot Entities, and two other Merkin managed funds – Gabriel Capital, L.P. ("Gabriel") and Ariel Fund Ltd. ("Ariel"). The *TAC* asserted claims to avoid and recover preferential and fraudulent transfers under the Bankruptcy Code and state law from initial and subsequent transferees, recover from Merkin as general partner of Ascot Partners and Gabriel, and disallow and/or equitably subordinate certain BLMIS customer claims filed by some of the defendants.

The defendants moved to dismiss the *TAC*. As described in the *Dismissal Decision*, the Court concluded that the Trustee had failed to allege that Merkin had actual knowledge of Madoff's fictitious trading, but did allege that he willfully blinded himself to that fact. Based upon the lack of actual knowledge, the Court dismissed all of

---

[2] "ECF Doc. # ___" refers to documents electronically filed in this adversary proceeding.

the avoidance claims other than Count Two, which alleged actual fraudulent transfers under 11 U.S.C. § 548(a)(1)(A). *Dismissal Decision*, 515 B.R. at 137-41. The Court also dismissed the equitable disallowance claims alleged in Counts Eleven and Twelve, *id.* at 153-57, but denied the branch of the motions seeking dismissal of the portion of the subsequent transfer claims that corresponded to the surviving fraudulent transfer claims under § 548(a)(1)(A), *id.* at 149-53, the general partner liability claims against Merkin, *id.* at 153, and the equitable subordination of claims. *Id.* at 157-61. The Trustee subsequently settled with and dismissed his claims against Gabriel and Ariel. (*See Stipulation of Dismissal and Consent Order*, dated Sept. 8, 2015 (ECF Doc. # 282).) As a result, the following Counts and Defendants remain:

| COUNT | DEFENDANT(S) | DESCRIPTION |
|-------|--------------|-------------|
| 2 | Ascot Partners | Avoid and recover transfers totaling $280,000,000 made within two-years of the Filing Date as intentional fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A), & 550(a) and 15 U.S.C. § 78fff-2(c)(3), and disallow any claim Ascot Partners may have against BLMIS pursuant to 11 U.S.C. § 502(d) until the transfers are returned to the Trustee. |
| 9 | Ascot Partners, Ascot Fund, GCC, Merkin | Recover subsequent transfers pursuant to 11 U.S.C. § 550(a). |
| 10 | Merkin | Impose general partner liability against Merkin for obligations of Ascot Partners. |
| 13 | Ascot Partners | Equitably subordinate the customer claim filed by Ascot Partners pursuant to 11 U.S.C. § 510(c). |

The Defendants have now moved for summary judgment on the *TAC*'s remaining counts.[3] In the main, they assert that Merkin did not willfully blind himself to the fraud

---

[3]    *Defendants J. Ezra Merkin and Gabriel Capital Corporation's Memorandum of Law in Support of Their Motion for Summary Judgment*, filed Oct. 8, 2015 ("*Merkin Brief*") (ECF Doc. # 285);

perpetrated by Madoff and BLMIS because he did not suspect that such fraud existed. He conducted extensive due diligence of BLMIS that did not indicate anything untoward, (*Merkin Brief* at 7-13 & 19-20; *Ascot Brief* at 14-19), and the Trustee points to red flags that were widely-known but dismissed by investors, auditors and regulators, all of whom were duped by Madoff. (*Merkin Brief* at 20-21; *Ascot Brief* at 2-3, 32-34; *Merkin Reply* at 6; *Ascot Reply* at 9-14.) The Trustee responds that summary judgment is not appropriate when, as here, the central issue is Merkin's state of mind. (*Trustee's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment*, dated Nov. 25, 2015 ("*Trustee Brief*"), at 42-45 (ECF Doc. # 289).) Further, the Trustee provides evidentiary support for his allegations that Merkin was aware of red flags but purposely ignored them. (*Id.* at 46-54.)

The Defendants raise other arguments as well. Ascot Fund contends that Merkin's knowledge should not be imputed to it, (*Ascot Brief* at 34-36; *Ascot Reply* at 20-22), Ascot Partners maintains that the Trustee has failed to identify any subsequent transfers that it received, (*Ascot Brief* at 36-37; *Ascot Reply* at 19-20), and the Merkin Defendants argue that the subsequent transfer and partner liability claims in Count Nine and Count Ten should be dismissed because Ascot Partners—the only initial transferee—will have sufficient assets to satisfy the judgment. (*Merkin Brief* at 27-28; *Merkin Reply* 19-22.) Lastly, Ascot Partners seeks the dismissal of the equitable

---

*Memorandum of Law in Support of the Motion for Summary Judgment of the Defendants Ascot Partners, L.P., and Ascot Fund Ltd.*, filed Oct. 8, 2015 ("*Ascot Brief*") (ECF Doc. # 284); *Defendants J. Ezra Merkin and Gabriel Capital Corporation's Reply Memorandum of Law in Support of Their Motion for Summary Judgment*, filed Dec. 23, 2015 ("*Merkin Reply*") (ECF Doc. # 306); & *Reply Memorandum of Law in Further Support of the Motion for Summary Judgment of Ascot Partners, L.P., and Ascot Fund Ltd.*, dated Dec. 23, 2015 ("*Ascot Reply*") (ECF Doc. # 308).

subordination claim because Merkin's conduct was not inequitable.  (*Merkin Brief* at 29-31; *Ascot Brief* at 37-43.)

## DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by FED. R. BANKR. P. 7056, governs motions for summary judgment. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.  *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995).  If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Where, as here, the defendant is the movant, it is entitled to summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.

A court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").  In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of

the nonmoving party.  *Matsushita Elec.*, 475 U.S. at 587; *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

## A.    The Defendants' Case[4]

Merkin was a money manager and partner in several investment funds, and occasionally conducted his business through his wholly-owned corporation, GCC.  (*See Ariel Offering Memorandum*[5] at GCC-P 0335720.)  Ascot Partners and Ascot Fund were formed in 1992 as a Delaware limited partnership and a Cayman Islands corporation, respectively.  (*See* Ascot Partners Offering Memorandum[6] at GCC-P 0335405; Ascot Fund Offering Memorandum[7] at GCC-P 0335118.)  Each Ascot Entity had its own BLMIS account, (*see Answer of Ralph C. Dawson, as Receiver of Ascot Partners, L.P., and Ascot Fund Ltd. to the Third Amended Complaint of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC*, dated Feb. 5, 2017, ¶¶ 64, 65 (ECF Doc # 260)), until January 2003 when they were reorganized into a "master-feeder" structure.  Following the reorganization, Ascot Fund invested all of its

---

[4]    Parties submitted evidence through attorney affidavits attaching relevant exhibits.  (*See Declaration of Neil A. Steiner in Support of Defendants' Motions for Summary Judgment*, dated Oct. 7, 2015 ("Steiner Decl.") (ECF Doc. # 286); *Declaration of Lan Hoang in Support of Trustee's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment*, dated Nov. 25, 2015 ("Hoang Decl.") (ECF Doc. # 293); and *Declaration of Neil A. Steiner in Support of Reply Memoranda in Further Support of Defendants' Motions for Summary Judgment*, dated Dec. 23, 2015 ("Steiner Reply Decl.") (ECF Doc. # 310).)

[5]    Steiner Decl., Ex. 16.

[6]    Steiner Decl., Ex. 15.

[7]    Steiner Decl., Ex. 17.

assets in Ascot Partners, which, in turn, invested substantially all of its assets in BLMIS. (*Id.*, ¶ 55.)  Hence, from their inception to the Filing Date, the Ascot Entities invested virtually all of their assets directly or indirectly in BLMIS.  (*See* Hoang Decl., Ex. 16.)

Merkin was the general partner of Ascot Partners and had the ultimate responsibility for its management, operations and investment decisions.  (*See* Ascot Partners Offering Memorandum at GCC-P 0335405.)  GCC served as Ascot Fund's investment advisor until the 2003 master-feeder reorganization, (*see* Termination Agreement[8] at AF00000187), but ceased to serve in that capacity thereafter.

The principal issue raised by the Motions is whether the Trustee can demonstrate at trial that Merkin willfully blinded himself to the fact that Madoff was not engaged in the actual trading of securities.  Willful blindness consists of two elements or prongs: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S. A.*, 131 S. Ct. 2060, 2070 (2011).  The substance of the Motions focuses on the first prong; it contends that Merkin conducted appropriate due diligence of BLMIS and Madoff, and did not suspect that Madoff was running a Ponzi scheme.  In that event, he could not have consciously avoided learning the true state of facts as required by the second prong.

The Defendants identify several categories of facts in support of their Motions. First, Madoff had a "sterling reputation."  (Transcript of Feb. 24-25, 2015 Deposition of

---

[8]    Hoang Decl., Ex. 69.

Merkin ("Merkin Dep. Tr.")[9] at 157:16-17.) Merkin met with Madoff in the late 1980s, (*id.* at 147:9-19, 153:17-22), and initially invested in BLMIS through an account held by an entity known as 61M Associates managed by the Scheuer family office. (*Id.* at 152:3-153:16.) Merkin's father—who was a businessman and investor—had a "very constructive opinion of Mr. Madoff and his investing abilities." (*Id.* at 147:20-150:7.) Merkin knew that Madoff was the chairman of NASDAQ, (*id.* at 157:20), that the SEC had investigated Madoff on several occasions, including in connection with the liquidation of BLMIS feeder fund Avellino & Bienes, without finding fraud, (*id.* at 214:1-18, 188:20-189:13), that Madoff had testified before Congressional committees on securities-related matters, (*id.* at 213:7-18), and that Madoff had a substantial market-making business constituting a significant share of trading in certain large cap stocks. (Transcript of Jan. 30, 2009 Deposition of Merkin[10] at 128:25-130:18, 131:22-132:4.) Merkin spoke to clients of Madoff's market-making business, and they had "very positive things to say." (Merkin Dep. Tr. at 174:12-17.) He also spoke to several clients of Madoff's investment advisory business who spoke highly of Madoff. (*See* Supplemental Responses to Interrogatories & Requests for Admission ("Supplemental Responses")[11] at 2-3.)

Second, once Merkin's funds began investing directly with BLMIS, employees of GCC entered each BLMIS trade confirmation into GCC's portfolio management system.

---

[9] Portions of the Merkin Dep. Tr. were submitted as Steiner Decl., Ex. 84; Hoang Decl., Ex. 8; and Steiner Reply Decl., Ex. 11.

[10] Steiner Decl., Ex. 85.

[11] Steiner Decl., Ex. 80. The Supplemental Responses are not entitled to any weight for reasons discussed below, and are included in this section solely to describe the Defendants' assertions.

(Transcript of Aug. 9, 2011 Deposition of Michael J. Achilarre[12] at 32:8-33:6.)  GCC was not able to input trade information on the day of the trade because BLMIS trade confirmations did not arrive at GCC for several days.  (Transcript of Oct. 19, 2011 Deposition of Michael E. Autera[13] at 84:2-18.)  After the BLMIS trades were inputted into GCC's portfolio system for the month, GCC employees reconciled them with BLMIS monthly statements.  (Transcript of Aug. 16, 2011 Deposition of Andrew Gordon ("Gordon Dep. Tr.")[14] at 36:21-37:1.)  If there was a discrepancy between the BLMIS trade confirmations and the BLMIS monthly statement, GCC employees contacted Frank DiPascali at BLMIS, and BLMIS would send supplemental trade confirmations to "make the numbers tie."  (*Id.* at 44:4-46:7.)

Third, Merkin hired the accounting firm of BDO Seidman, LLP ("BDO") to perform yearly audits of his funds, including the Ascot Entities.  (Transcript of Oct. 10, 2012 Deposition of Robert Castro ("Castro Dep. Tr.")[15] at 26:7-9.)  Among the tasks performed by BDO was confirmation that the year-end balances on the funds' financial statements agreed with amounts due from its clearing brokers.[16]  BDO reviewed statements provided by the brokers and also tested the price of the securities' positions

---

[12]    Stein Decl., Ex. 90.

[13]    Hoang Decl., Ex. 11.

[14]    Hoang Decl. Ex. 27.

[15]    Portions of the Castro Dep. Tr. were submitted as Steiner Decl., Ex. 92 & Hoang Decl., Ex. 28. Exhibit 92 to the Steiner Decl. was filed under seal while exhibit 28 to the Hoang Decl. was not. Defendants have not sought to seal any portion of Hoang Decl., Ex. 28 in the many months since its filing, and no party has suggested any reason why the deposition transcript is confidential.

[16]    As discussed in the succeeding text, BLMIS cleared its own trades and did not use an independent clearing broker.

with an independent source such as Bloomberg. (*Id.* at 88:12-91:16.) In addition to confirming the funds' year-end balances, BDO confirmed the existence of a "handful" of the funds' positions by comparing them with the amount and quantity set forth in BLMIS brokerage statements and trade confirmations. (*Id.* at 91:17-92:17, 104:6-105:7, 117:4-11.)

Merkin points to several other facts in support of his contention that he did not suspect Madoff's fraud or have any reason to: he spoke to Madoff roughly once a month over the course of many years, (Merkin Dep. Tr. at 186:13-17, 212:6-213:6, 428:18-431:7); he was comforted by the ease with which his funds received redemptions from BLMIS noting that "it was always easier to get money out than to put money in and that to me is a very positive sign," (*id.* at 217:13-15); he maintained a file (the "Madoff File")[17] that, among other things, contained articles about Madoff and notes from meetings, (Supplemental Responses at 3-4); and he and his family lost over $110 million through their investment in his funds. (Merkin Dep. Tr. at 635:23-650:8.)

Finally, the Merkin Defendants submitted the reports of their expert, Jeffrey M. Weingarten, who opined that "[t]aken on the whole, the Merkin Defendants, in [his] opinion, pursued what would certainly be described as adequate due diligence on Madoff, his investment strategy and his operations." (Expert Report of Jeffrey M. Weingarten,[18] at 6.) According to Weingarten, adequate due diligence for an investment manager involves determining five characteristics about a potential investment:

---

[17]    A copy of the Madoff File was submitted as Hoang Decl., Ex. 19.

[18]    Steiner Decl., Ex. 11; *see also* Steiner Decl., Ex. 12 (Rebuttal Expert Report of Jeffrey M. Weingarten).

philosophy, process, procedures, people and performance.  (*Id.* at 3.)  With respect to

Madoff and BLMIS, Weingarten concluded that Merkin's diligence satisfied these

criteria because he (i) understood that Madoff sought to achieve steady gains with below

average risk, (ii) understood that Madoff achieved his results by implementing the SSC

Strategy, (iii) received and reviewed trade confirmations, (iv) knew that Madoff was

highly regarded, and (v) observed that the investment's performance was consistent

with the strategy.  (*Id.* at 3-5.)

**B.    Trustee's Evidence of Merkin's Willful Blindness**

**1.    The First Prong**

The Trustee submitted evidence that Merkin learned about the possibility of

fraud at BLMIS and also voiced his own concerns.  Merkin was cautioned about Madoff

as early as 1992 by Victor Teicher—a money manager for Gabriel and Ariel.  Teicher

warned Merkin that Madoff's returns were too consistent, (Transcript of Feb. 9, 2009

Deposition of Victor Teicher ("Teicher Dep. Tr.")[19] at 41:2-45:15), he expressed concerns

that BLMIS self-cleared its own trades, (*id.* at 44:18-45:7; Errata Sheet[20] for Victor

Teicher's Feb. 9, 2009 Deposition at 2 (stating that Teicher specifically remembered

discussing self-clearing issues with Merkin)), and he suggested that Merkin not invest

with Madoff.  (Teicher Dep. Tr. at 48:6-12.)  Jack Mayer, who worked for Teicher,

recalled a conversation with Merkin from the early 90's in which Teicher "expressed the

concern that [BLMIS] could be a Ponzi scheme."  (Transcript of Oct. 11, 2011 Deposition

---

[19]    Steiner Decl., Ex. 107.

[20]    Hoang Decl., Ex. 51.

of Jack N. Mayer[21] at 64:14-65:4.)  Teicher did not specifically recall that conversation but stated that "it wouldn't surprise [him] if a conversation like that happened." (Transcript of Oct. 29, 2013 Deposition of Victor Teicher[22] at 119:8-21.)

During the same timeframe, Merkin suggested to investor Joel Ehrenkranz that he consider investing with BLMIS.  Ehrenkranz was concerned that BLMIS self-cleared its own trades instead of clearing trades through a third-party such as Merrill Lynch, Morgan Stanley or Goldman Sachs, (Transcript of Mar. 20, 2014 Deposition of Joel Ehrenkranz[23] at 48:4-49:7), and expressed his anxieties to Merkin.  (*Id.* at 55:16-25.) Around the time he created the Ascot Entities, Merkin encouraged Ehrenkranz's investment assuring him that he would provide the independent verification of BLMIS that Ehrenkranz had previously found to be lacking.  (*Id.* at 58:1-20.)  Ehrenkranz invested in an Ascot Entity but redeemed his investment by the end of 1995 because Madoff's ability to achieve consistently positive returns "belied logic" and made Ehrenkranz "very uncomfortable."  (*Id.* at 64:22-65:18.)  Ehrenkranz had many discussions with Merkin opining that it was "almost impossible" for Madoff to achieve his returns.  (*Id.* at 65:19-25.)

Merkin was aware that BLMIS employed Friehling & Horowitz – a small firm with one active accountant – as its independent auditor.  (Transcript of Feb. 9, 2009

---

[21]    Hoang Decl., Ex. 54.

[22]    Hoang Decl., Ex. 52.

[23]    Hoang Decl., Ex. 36.

Deposition of Merkin[24] at 165:12-14.)  A Gabriel investor, Joshua Nash, saw BLMIS' lack of a major accounting firm to audit BLMIS as a red flag and shared that opinion with Merkin.  (Transcript of Oct. 18, 2012 Deposition of Joshua L. Nash[25] at 51:10-52:8.)

While the movants tout Merkin's Madoff File as evidence of his due diligence, the Trustee argues that at least some of the documents in it raised suspicions of fraud at BLMIS.  For example, the Madoff File contained a February 1996 document titled "Comparing Promeo [sic] Manager Series B and the S&P500" ("Primeo Analysis").[26] Merkin thought that the Primeo Analysis described the performance of a Madoff feeder fund.  (Merkin Dep. Tr. at 286:19-22; *id.* at 290:23-24.)  The Primeo Analysis contained several charts that compared the performance of the S&P500 with the performance of Primeo between June 1989 and December 1995, including charts showing Primeo's performance during months in which the S&P500 index was down.  The Primeo Analysis concluded that Primeo "achieve[d] consistent results, whether the S&P500 trend[ed] up or down" and that the "performance of [Primeo was] to a large degree independent of the gyrations of the S&P500."  (Primeo Analysis at GCC-P 0393213, GCC-P 0393219.)

The Madoff File also contained a typewritten transcript of a part of a January 14, 2002 conversation between Merkin and Madoff ("Jan. 2002 Tr.")[27] that included some

---

[24]    Hoang Decl., Ex. 66.

[25]    Hoang Decl., Ex. 30.

[26]    Hoang Decl., Ex. 19 at GCC-P 0393213 – GCC-P 0393226.

[27]    Hoang Decl., Ex. 19 at GCC-P 0393364 – GCC-P 0393373.

curious exchanges.  First, Merkin raised the issue of transparency and scalability.
Investors generally know or can find out how much money their money manager is
overseeing.  In Madoff's case, Merkin acknowledged that neither he nor anyone else
knew the amount invested with BLMIS, and that he had "given up guessing."  Madoff
then asked why people cared about the amount he managed, and Merkin raised
scalability, observing that "one of the tenets of the investment business" was that there
was "some basic connection between size and profitability."   Merkin added that he
couldn't tell if he was one of Madoff's top clients, but conceded that "I don't really care,
because I've made my peace with Bernie."  (Jan. 2002 Tr. at GCC-P 0393364.)

    Merkin also questioned BLMIS' uncanny consistency.  He told Madoff that
"nobody really knows of anybody who does what you do who is competitive with you, at
least that's available to the investing public. . . .  I don't know anybody who has a
strategy just like yours and who have your returns, but not adjusted to volatility."  (*Id.* at
GCC-P 0393365.)

    The conversation also covered Madoff's unusual fee structure.  Merkin's initially
guessed that Madoff charged "somewhere between 3% and 4%" of principal investment
to which Madoff replied: "What would you say if I told you I don't make 1.5%?"  (*Id.* at
GCC-P 0393368; Merkin Dep. Tr. at 479:15-480:24.)  After discussing BLMIS' low
investment fees further, Merkin finally commented, "I know why you don't do it.
Because you're Bernie.  Because that's not the way the good Lord made you.  If he made
you a little differently, you would."  (Jan. 2002 Tr. at GCC-P 0393369.)

Subsequently, in June 2003, Merkin expressed his concerns about BLMIS to two representatives of "Research Company A" – a company engaged to perform on-going due diligence for third-parties' investments in the Ascot Entities.  Since the funds had substantial exposure to BLMIS, due diligence involved analyzing BLMIS.  Research Company A's founder and its research director participated on a call with Merkin. According to the research director, (1) Merkin lacked a good explanation on the scalability of BLMIS' option trades, and had "come to accept" that there were "things that [he didn't] understand," (Transcript of Nov. 22, 2013 Deposition of research director[28] at 46:3-23), (2) Merkin advised to "[n]ever go long in a big way" in its BLMIS investment, and stated that "Charles Ponzi would lose out because it would be called the Madoff scheme," (*id.* at 53:3-53:23; *see also id.* at 65:3-8 ), and (3) there "seem[ed] to be some probability even in [Merkin's] mind that this could be a fraud."  (*Id.* at 76:1-14; *see also id.* at 82:13-16 ("Q.  During the June 2003 call did Mr. Merkin speculate that BLMIS may be a Ponzi scheme?  A.  Yes.").)[29]

Perhaps the most compelling piece of evidence supplied by the Trustee concerned Merkin's reaction to the revelation of another, similar fraudulent scheme.  In August 2005, a group of Connecticut investment funds known as the "Bayou Group" was exposed as a Ponzi scheme.  The principals were arrested and pleaded guilty to various fraud charges.  *See Adams v. Marwil* (*In re Bayou Grp., L.L.C.*), 363 B.R. 674, 677-78

---

[28]    Hoang Decl., Ex. 42.  The parties filed exhibits related to Research Company A under seal, including exhibit 42 to the Hoang Decl., to protect the identity of the entity and its officers.  Whether these items are confidential has yet to be addressed, and the Court need not make that determination to decide the Motions.

[29]    The Merkin Defendants' counsel objected to the form of this series of questions, as he did to most. The Court has reviewed the objections, concludes that they lack merit, and they are overruled.

(S.D.N.Y. 2007), *aff'd*, 564 F.3d 541 (2d Cir. 2009).  In the wake of the Bayou Group

Ponzi scheme, Merkin circulated an email on September 7, 2005 to himself, Rick Annis,

Launny Steffens, Greg Ho and David S. Gottesman.[30]  The subject of the email was,

"Issues we should of [sic] asking each of our money managers," and listed the following

"issues":

> (1)  Clearing firm
>
> (2)  Unusual, unconventional, or self-owned broker-dealer relationships
>
> (3)  Auditing firm
>
> (4)  Law Firm
>
> (5)  Use of leverage
>
> (6)  Pricing of Fund (level of marketable securities, marketable but thin,
> and privates)

(Hoang Decl., Ex. 49.)

Merkin knew that BLMIS met three of these criteria.  It cleared its own trades (a

subject of numerous warnings in the past), it used a small accounting firm that could

not possibly handle BLMIS' auditing work (also the subject of a past warning) and

BLMIS used an unusual fee structure that deprived it of substantial revenue (which

perplexed Merkin).

Merkin also recognized that the Bayou debacle would trigger questions about

Madoff.  Madoff and Merkin had a conversation about the Bayou Group fraud after it

was exposed:

> [Merkin]:    We got our share of a couple of questions about Bayou,
> which I'm sure you got one too, and . . .

---

[30]    The record on the Motions did not identify the affiliation of the recipients of the email, but the
*TAC* stated that Annis, Steffens, Ho and Gottesman were other fund managers.  (*TAC*, ¶ 222.)

[Madoff]:    Questions from who?

[Merkin]:    You know, I always tell people, as soon as there is a scam in the hedge fund industry, someone's gonna call about Bernie. . . . It's guaranteed.

(Hoang Decl., Ex. 21 at 3:1-9.)

## 2.    The Second Prong

The Trustee also provided evidence supporting the inference that Merkin consciously avoided confirming his suspicions about BLMIS' fraudulent operations.  In fact, Merkin admitted that he stopped asking Madoff questions.  While discussing issues going to the scalability of BLMIS' investment operation in 2002, Merkin proclaimed that "you could stop caring" because Madoff had "been defying gravity for long enough," and, in fact, "[he didn't] really care, because [he'd] made [his] peace with Bernie."  (Jan. 2002 Tr. at GCC-P 0393364.)

Merkin also advised others to avoid asking about BLMIS:

I can always tell when people are going to ask me about Bernie, because when people come to the office, ask me what we're doing and I give them a little sense of it, and they look around and say I know I'm not supposed to talk about this, but can I ask you the following question?  So I told one person, look, you can ask me how Bernie does it and that's fine, but when are you going to ask Bernie?  So he said, if I asked him, he'd throw me out.  I said, look, all I can tell you is *don't ask so many questions*.  Sit tight.  And that's what I tell everybody.

(*Id.* at GCC-P 0393371 – GCC-P 0399372 (emphasis added).)

His post-Bayou conduct may be the most puzzling.  As set forth above, Merkin sent an email to other fund managers listing indicia of fraud that they should be asking their money managers about.  Merkin knew that several of the red flags he identified

applied to BLMIS, but there is no evidence that he did anything to confirm that BLMIS was a legitimate operation and not a Ponzi scheme like Bayou.

Finally, according to the Trustee's expert Dr. Steve Pomerantz, due diligence consistent with industry norms would have revealed numerous red flags related to the Merkin funds' BLMIS accounts. (Initial Expert Report of Dr. Steve Pomerantz,[31] at ¶¶ 2, 375.) He explained that on-going diligence of an investment requires a money manager to investigate indicia of fraud. (*Id.* at ¶¶ 66-73.) As noted, there is evidence implying that Merkin did not conduct that investigation despite his suspicions.

## C.    Count Two (Avoidance of Intentional Fraudulent Transfers)

With this background, I turn to the remaining Counts that the Defendants ask me to dismiss. Count Two of the *TAC* seeks to avoid and recover withdrawals made within two-years of the Filing Date from BLMIS to Ascot Partners' BLMIS account in the amount of $280,000,000 (the "Transfers") as intentional fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1). Such claims are subject to a defense to the extent that the transferee took "for value and in good faith." 11 U.S.C. § 548(c). The District Court has ruled that the Trustee must plead and prove the inapplicability of this defense. *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18, 24 (S.D.N.Y. 2014) ("*Good Faith Decision*") ("[T]he Court concludes that, in a SIPA proceeding such as this, a defendant may succeed on a motion to dismiss by showing that the complaint does not plausibly allege that that defendant did not act in good faith."). Here, Ascot Partners gave "value" because the Transfers constituted the return of principal. Hence, the sole factual issue is whether

---

[31]    ECF Doc. # 294, Ex. 1.

Ascot Partners took the transfers in "good faith." *Picard v. Katz*, 462 B.R. 447, 453 (S.D.N.Y. 2011).[32]

In the context of the BLMIS SIPA case, "'good faith' means that the transferee neither had actual knowledge of the [BLMIS] fraud nor willfully blinded himself to circumstances indicating a high probability of such fraud." *Good Faith Decision*, 516 B.R. at 23. In the *Dismissal Decision*, the Court ruled that the Trustee failed to plead "actual knowledge," 515 B.R. at 140-41, so the remaining inquiry for purposes of Count Two is whether Merkin, as the general partner of Ascot Partners, willfully blinded himself to the BLMIS fraud.[33]

The willful blindness inquiry asks whether an individual took deliberate action to avoid confirming a fact *after* learning that there was a high probability that such fact was true. *Global-Tech*, 563 U.S. at 769; *accord Meoli v. Huntington Nat'l Bank* (*In re Teleservices Grp., Inc.*), 444 B.R. 767, 814-15 (Bankr. W.D. Mich. 2011) ("Including willful blindness as a substitute for actual knowledge, though, adds a temporal aspect to the analysis."); *cf. Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 84 n.14 (2d Cir. 2005) (The doctrine of conscious avoidance "does not tolerate a person shutting his eyes to a fact . . . *after* realizing its high probability. . . .") (emphasis in original). Although Merkin has proffered evidence of early and in some cases pre-investment due diligence,

---

[32]    The Defendants have not challenged the Trustee's ability to prove the other elements of his intentional fraudulent transfer claim.

[33]    Ascot Partners does not contest the imputation of Merkin's knowledge and actions to it.

the question is what did he learn about BLMIS as the years passed, and what did he do with that information.

As noted, the evidence supports the inference that Merkin strongly suspected that Madoff was running a Ponzi scheme based upon what he learned, what he was told and what he said.  Merkin was warned by Teicher, Ehrenkranz and Nash of BLMIS red flags including the impossibly consistent returns, the self-clearing of trades and the use of a too-small accounting firm to conduct audits.   Merkin also learned that BLMIS' returns were inconsistent with the expected returns of an investor employing the SSC Strategy, Madoff's investment strategy lacked scalability, the amount of assets BLMIS had under management was unknown and BLMIS charged management fees that were significantly below market.  In addition, Merkin advised two representatives of Research Company A during a 2003 meeting not to make BLMIS a large part of their portfolio despite the consistent returns and alluded to BLMIS being a Ponzi scheme.[34]

The Defendants point to inconsistent statements by Teicher suggesting that Merkin was fooled like everyone else, (*Merkin Brief* at 16), and inconsistent versions of the June 2003 telephone call given by the two Research Company A representatives, (*Merkin Brief* at 16-17; *Ascot Brief* at 11), but these inconsistencies manifest the inherent factual disputes regarding the question of Merkin's state of mind.  In addition, Merkin testified that he was reassured by the ease with which investors could redeem

---

[34]    In the *Dismissal Decision*, the Court concluded that Merkin's Ponzi scheme allusions seemed more like jokes, and did not support an inference that he knew that BLMIS was a Ponzi scheme. *Dismissal Decision*, 515 B.R. at 140.  Nevertheless, when viewed together with the other evidence supplied by the Trustee on the first prong of the willful blindness question, his statements lend support to his suspicions about Madoff; why would Merkin even joke about it if the thought wasn't in his mind?

their funds from BLMIS, but when the Ascot Entities received redemption requests from their investors and needed to draw funds from BLMIS, Madoff called GCC apparently to question the redemptions and complain. Merkin returned Madoff's call and eventually "apologized, and smoothed things over." (Hoang Decl., Ex. 22.)

The Merkin Defendants also claim that the maintenance of the Madoff File evidences Merkin's diligence. (*Merkin Brief* at 9.) They cite to their Supplemental Responses to interrogatories for support, (s*ee* Supplemental Responses at 3-4 (supplemental answer to interrogatory nos. 1,2,3,7,8,9,10,11, and 13)), but the Supplemental Responses were signed only by the attorney and not Merkin as required under Federal Civil Rule 33(b)(5). *See* 7 CLAUDIA WILKEN & ROBERT M. BLOOM, MOORE'S FEDERAL PRACTICE § 33.104 (3d ed. 2016) ("[D]espite counsel's substantial assistance, it is not proper or acceptable for the attorney alone to sign or verify responses."). Thus, they are not entitled to any weight for purposes of the Motions but even if they were, the fact that Merkin kept a file on Madoff, including a transcript of a part of the January 2002 phone conversation with Madoff,[35] raises more questions than it answers.

The Defendants point out as well that Merkin and his family lost $110 million from their personal investment in his funds. (Merkin Dep. Tr. at 636:1-7 (stating that he and his family had exposure of roughly $110 million across the funds).) They ask the Court to infer that Merkin would not have put his and his family's money at risk if he was highly suspicious of BLMIS. However, Merkin's deposition testimony as to the

---

[35]    Merkin stated that he recorded and transcribed calls with Madoff when he thought they were "covering important material and [he] wasn't able to make a note of it and grasp it at the same time." (Merkin Dep. Tr. at 447:9-16.) Merkin spoke to Madoff once a month for several years but recorded only the January 2002 conversation and one other.

losses was imprecise, (*e.g.*, *id.* at 639:22-640:5 (thinks amounts invested by entity called

JEM 2000 Trust was associated with him); *id.* at 640:18-641:2 (did not know whether

investments by entities called Merkin Trusts and Merkin Trusts 2 were included in the

loss total); *id.* at 641:14-19 (stating that amount invested by his mother-in-law "[m]ight

have been" included)), and any favorable inference is undercut by the $685 million in

fees Merkin received through 2007 for managing the same funds in which he and his

family invested.  (Hoang Decl., Ex. 17 at 23.)

Despite the knowledge that Madoff was likely operating a fraudulent enterprise,

the evidence supports the inference that Merkin did nothing to allay his suspicions.  His

ongoing due diligence relied on GCC's reports and BDO's audits to alleviate his concerns

but (i) GCC's monthly process consisted of matching the BLMIS trade confirmations

against the BLMIS monthly statements (or as it turned out, comparing one set of

fraudulent documents with another), (Gordon Dep. Tr. at 36:21-37:1), and (ii) BDO's

audits were limited to Merkin's funds and did not extend to confirming BLMIS' trading

activity.  (Castro Dep. Tr. at 116:12-22.)  Moreover, the evidence indicates that Merkin

gave up seeking answers from Madoff.  During his January 2002 conversation with

Madoff, Merkin stated that he had "given up guessing" about the scalability of Madoff's

investment advisory operation, and admitted, "I don't really care, because I've made my

peace with Bernie."  (Jan. 2002 Tr. at GCC-P 0393364.)  Merkin advised others to

follow suit telling them to "[s]it tight" and to not "ask so many questions."  (*Id.* at GCC-P

0393371.)  Finally, after the Bayou Ponzi scheme was discovered, Merkin warned others

to advise their money managers to be wary of certain indicia of fraud that he knew

applied to BLMIS, but there is no evidence that he followed-up with BLMIS and there is evidence that he gave up asking Madoff.

"Summary judgment is notoriously inappropriate for determination of claim in which issues of intent, good faith and other subjective feelings play dominant roles." *Krishna v. Colgate Palmolive Co.* 7 F.3d 11, 16 (2d Cir. 1993) (citation and internal quotation marks omitted); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.) (recognizing that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated"), *cert. denied*, 474 U.S. 829 (1985). While summary judgment may nonetheless be granted on a "state of mind" issue when the non-movant fails to come forward with contrary evidence, *Meiri*, 759 F.2d at 998 ("The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."), the Trustee has adduced evidence supporting the inference that Merkin was aware of the high probability that BLMIS was a Ponzi scheme and turned his back. In short, Merkin's state of awareness and what he did present disputed issues of fact.

Accordingly, the motion for summary judgment dismissing Count Two is denied.

## D.    Count Nine (Recovery of Subsequent Transfers)

Count Nine seeks to recover subsequent transfers of the avoided initial transfers pursuant to Bankruptcy Code § 550(a)(2) from GCC and Ascot Fund, as well as subsequent transfers to Merkin or for his benefit.[36] The Trustee offered evidence that

---

[36]    Counsel to the Trustee informed the Court that he was no longer prosecuting subsequent transfer claims against Ascot Partners. (*Transcript of June 1, 2016 Hr'g* at 71:24-72:8 (ECF Doc. # 323).) Thus, Ascot Partners is entitled to summary judgment on Count Nine.

these Defendants received subsequent transfers.  The Trustee's expert opined that the Defendants commingled their bank accounts with BLMIS funds and funds from other sources.  (Expert Report of Lisa M. Collura, CPA, CFE, CFF,[37] at ¶ 62.)  As a result, she applied five tracing methods to determine the amounts subsequently transferred to each subsequent transferee, and amounts further subsequently transferred to or for the benefit of Merkin.  (*Id.* at ¶¶ 80-133.)  The Defendants' expert responded that only two of the tracing methodologies were appropriate in this case.  (Expert Rebuttal Report of Paul K. Meyer TM Financial Forensics, LLC,[38] at ¶¶ 36-45.)  Thus, the amounts of the transfers and the appropriate methodology for their calculation are disputed issues for trial, although it does not appear that the fact of the subsequent transfers is.

The more difficult issue relates to the imputation of Merkin's willful blindness to the Ascot Fund.  Bankruptcy Code § 550(b)(1) provides a complete defense to a subsequent transferee to the extent he "takes for value . . . in good faith, without knowledge of the voidability of the transfer."  *Accord Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13, 37-39 (Bankr. S.D.N.Y. 2016) (describing application of the section 550(b)(1) defense to BLMIS subsequent transfer claims).  The "good faith" requirements in Bankruptcy Code §§ 548(c) and 550(b)(1) are the same — *i.e.* the subsequent transferee must not know or willfully blind himself to the fact that BLMIS was not engaged in the actual trading of securities.  *Good Faith Decision*, 516 B.R. at 23.

---

[37]     ECF Doc. # 295, Ex. 1.

[38]     Hoang Decl., Ex. 74.

While the Court observed in the *Dismissal Decision* that it did not appear Merkin's knowledge could be imputed to Ascot Fund, 515 B.R. at 151, the evidence submitted with the Motions shows otherwise.  From February 20, 1992 until December 31, 2002, GCC served as the Ascot Fund's investment advisor.  (Termination Agreement[39] at AF00000187.)  The formal termination of GCC's role as Ascot Fund's investment advisor coincided with the reorganization of Ascot Fund to become a feeder-entity for Ascot Partners.  Merkin, as GCC's president, sent a letter on November 11, 2002 to Ascot Fund investors informing them that the new master-feeder structure would make the investing process "cheaper and more efficient."  (GCC Letter to Ascot Fund Investors[40] at GCC-NYAG 0031102.)  Merkin also informed Ascot Fund investors that with GCC's termination, investment advisory fees would instead be paid to Ascot Partners—where Merkin served as general partner.  (*Id.*)

Despite the changes, Merkin "assured" Ascot Fund investors that *he* would "continue to direct the management and investing of Ascot Partners as its sole General Partner, [and Merkin did not] anticipate that these changes [would] have any substantive impact on investors in *either the offshore* [*i.e.* Ascot Fund] or domestic [*i.e.* Ascot Partners] fund."  (*Id.* (emphasis added).)[41]  The letter further promised delivery of a revised prospectus, (*id.* at GCC-NYAG 0031103), which was sent in January 2003 and provided, *inter alia*:

---

[39]    Hoang Decl., Ex. 69.

[40]    Hoang Decl., Ex. 12.

[41]    Merkin sent a similar message to investors of Ascot Partners on the same day.  (Hoang Decl., Ex. 70 at BS00451097 ("This change should not have any substantive impact on the investors in either Ascot Partners or Ascot Fund.").)

- Shareholders in Ascot Funds held non-voting shares, and *all* voting shares were held by GCC, (Ascot Fund Prospectus[42] at BS00020961 & BS00020973) (emphasis added);

- The "general purpose" of Ascot Fund was to achieve above average returns through its investment in Ascot Partners while reducing risk as deemed appropriate by Merkin, (*id.* at BS00020961); and

- Merkin implemented Ascot Partners' investment policies and objectives, and could alter investment strategies in his discretion.  (*Id.* at BS00020962 & BS00020970.)

Deposition testimony of Ascot Fund directors corroborated the prominent role Merkin—through his role as general partner of Ascot Partners (the master fund) and president of GCC (holding all Ascot Fund voting shares)—had in Ascot Fund. (Transcript of Jan. 13, 2015 Deposition of Don M. Seymour[43] at 77:17-23 ("The governance of [Ascot Partners] is by [Merkin].  I was not the general partner of Ascot Partners.  I was a director of Ascot Fund.  [Ascot Fund] invested in the general partner, of which I have no responsibility for.  And that was under the complete discretion of Mr. Merkin, as the general partner."); *id.* at 92:5-9 ("The voting shares of [Ascot Fund] was held by [Merkin].  And the voting shares actually controlled [Ascot Fund], including the board."); (Transcript of the Jan. 14, 2015 Deposition of Aldo Ghisletta[44] at 79:17-80:2 ("Q:  Could the Board of Directors of Ascot Fund have decided to change Ascot Fund's investment strategy without the approval of Mr. Merkin? . . . A:  No.").)  Thus, there are disputed issues of material fact pertaining to the imputation of Merkin's knowledge to Ascot Fund.

---

[42]    Hoang Decl., Ex. 18.

[43]    Hoang Decl., Ex. 71.

[44]    Hoang Decl., Ex. 73.

The Merkin Defendants argue that subsequent transfer claims against them should be dismissed for a separate reason. (*Merkin Brief* at 27-28; *Merkin Reply* at 19-22.) They maintain that Ascot Partners has or will have an allowed net equity claim of $506 million consisting of (1) a $226 million customer claim (the "SIPA Claim"), and (2) a $280 million claim under Bankruptcy Code § 502(h). The Trustee has already distributed 55.685% (as of the filing of the *Merkin Brief*[45]), but has not distributed anything to Ascot Fund because the allowance of the SIPA Claim is disputed for the reasons discussed shortly. The Merkin Defendants compute that Ascot Partners will recover at least $281 million on their SIPA Claim and 502(h) claim which will be sufficient to satisfy the Trustee's judgment. In fact, with the latest interim distribution, the combined value of the SIPA Claim and section 502(h) claim is worth approximately $303 million.

This argument fails as a matter of law for several reasons. First, the Trustee may recover avoided transfers from an initial transferee *or* a subsequent transferee, 11 U.S.C. § 550(a)(1) – (2), and need not seek recovery first from the initial transferee. *IBT Int'l, Inc. v. Northern* (*In re IBT Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706 (11th Cir. 2005) ("In short, once the plaintiff proves that an avoidable transfer exists he can then skip over the initial transferee and recover from those next in line."); *see SIPC v. BLMIS* (*In re BLMIS*), 501 B.R. 26, 31 (S.D.N.Y. 2013) ("[T]here is no basis in the language of either section 550(a) or in the Bankruptcy Code's avoidance provisions to assume that

---

[45]    More recently the Court approved the Trustee's application to make another interim distribution, (*see Order*, dated Jan. 12, 2017 (ECF Adv. P. No. 08-01789 Doc. # 14836)), that will provide up to 60.098% of a customer's allowed claim amount. (*See Motion for an Order Approving Eighth Allocation of Property to the Fund of Customer Property and Authorizing Eighth Interim Distribution to Customers*, dated Dec. 14, 2016 at ¶ 7 (ECF Adv. P. No. 08-01789 Doc. # 14662).)

avoidance actions must be brought—or fully adjudicated—against an initial transferee for recovery proceedings to go forward against a subsequent transferee."); 5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 550.02[1] at 550-6 (16th ed. 2016) ("The better view, adopted by the majority of courts, is that a transfer may be found avoidable and a recovery may be had from a subsequent transferee without suing the initial transferee.").

Second, the Merkin Defendants ignore Bankruptcy Code § 502(d).  Section 502(d) of the Bankruptcy Code provides that "the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title."  If the Trustee avoids the transfers, Ascot Partners' SIPA Claim will be automatically disallowed.  Because of this possibility, the Trustee has held back the distributions that would otherwise be payable to Ascot Partners.  In order to receive any distribution, Ascot Partners must first return the transfers, *i.e.*, write a $280 million check to the Trustee.  Obviously, it cannot pay the Trustee with a distribution it will not receive unless it first makes that payment.

Third, and for like reason, Bankruptcy Code § 502(h) will give Ascot Partners a claim only to the extent the Trustee *recovers* the avoided Transfers from Ascot Partners.  Bankruptcy Code § 502(h) provides that

> [a] claim arising from the *recovery* of property under section . . . 550 . . . of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this

section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(h) (emphasis added).  Furthermore, unless Ascot Partners returns the entire Transfer, its § 502(h) claim will be disallowed under § 502(d).

Accordingly, the motion for summary judgment dismissing Count Nine is granted as to Ascot Partners but is otherwise denied.

## E.    Count Ten (General Partner Liability)

Count Ten seeks to impose general partner liability against Merkin for the debts of Ascot Partners, a Delaware partnership.  *See Dismissal Decision*, 515 B.R. at 153.  The Merkin Defendants argue that general partner liability cannot serve as a basis for recovery of an avoidance claim under the Bankruptcy Code.  (*Merkin Brief* at 27 n.7; *Merkin Reply* at 22.)  The Merkin Defendants previously made this argument in connection with their first motion to dismiss and lost it.  Judge Lifland, then presiding over the BLMIS liquidation, held that the Trustee "is empowered under section 550(a) of the Code to recover avoided transfers from a partnership as initial transferee, or from the general partner of a partnership under applicable state partnership law."  *Picard v. Merkin* (*In re BLMIS*), 440 B.R. 243, 269 (Bankr. S.D.N.Y. 2010), *leave to appeal denied*, No. 11 mc 0012 (KMW), 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011); *accord Shubert v. Stranahan* (*In re Penn. Gear Corp.*), Adv. P. Nos. 03–940, 03-0942 (DWS), 2008 WL 2370169, at *9 (Bankr. E.D. Pa. Apr. 22, 2008).  That ruling is law of the case, and the Merkin Defendants have not explained why it should be reconsidered.[46]

---

[46]    The Merkin Defendants rely on inapposite cases.  *E.g. Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair*, 419 B.R. 749, 760 (M.D. Tenn. 2009) (section 550 does not allow recovery of punitive damages); *Savage & Assocs., P.C. v. BLR Servs. SAS* (*In re Teligent, Inc.*), 307 B.R. 744, 748-49 (Bankr.

The Merkin Defendants also argue that the Trustee could not execute a judgment against Merkin as a general partner of Ascot Partners because the Trustee cannot meet the criteria set forth under Delaware law. (*Merkin Reply* at 22-23.) According to Title 6, § 17-403(d) of the Delaware Code:

> A judgment creditor of a general partner of a limited partnership may not levy execution against the assets of the general partner to satisfy a judgment based on a claim against the limited partnership unless:
>
> (1)    A judgment based on the same claim has been obtained against the limited partnership and a writ of execution on the judgment has been returned unsatisfied in whole or in part;
>
> (2)    The limited partnership is a debtor in bankruptcy;
>
> (3)    The general partner has agreed that the creditor need not exhaust the assets of the limited partnership;
>
> (4)    A court grants permission to the judgment creditor to levy execution against the assets of the general partner based on a finding that the assets of the limited partnership that are subject to execution are clearly insufficient to satisfy the judgment, that exhaustion of the assets of the limited partnership is excessively burdensome, or that the grant of permission is an appropriate exercise of the court's equitable powers; or
>
> (5)    Liability is imposed on the general partner by law or contract independent of the existence of the limited partnership.

DEL. CODE ANN. tit. 6, § 17-403(d)(1) - (5) (West 2016).

The Merkin Defendants' raised this argument for the first time in their reply brief, and the Court will not consider it. *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief").[47]  Furthermore,

---

S.D.N.Y. 2004) (estate representative may not rely on section 544(b) to pursue a breach of fiduciary duty claim against debtor's former officer/director).

[47]    The Merkin Defendants purport to be responding to the *Trustee Brief* at n.13, (*Merkin Reply* at 22), but that footnote in the *Trustee Brief* was simply reciting the well-known axiom that general partners of limited partnerships are jointly and severally liable for the obligations of the partnership. The Trustee did not address any issue regarding execution of a judgment, let alone whether execution against a general partner is appropriate under the circumstances.

the argument rests, in part, on the debunked notion that Ascot Partners will be able to satisfy the Trustee's judgment.  At a minimum, questions of fact exist as to whether Ascot Partners' assets are insufficient to pay the judgment (and the Court therefore grants permission to execute the judgment against Merkin's assets) or the Trustee's writ of execution against Ascot Partners will be returned unsatisfied.  In either case, Merkin will be liable under Delaware law.

Accordingly, the motion for summary judgment dismissing Count Ten is denied.

## F.    Count Thirteen (Equitable Subordination)

Count Thirteen seeks to equitably subordinate Ascot Partners' customer claim pursuant to section 510(c) of the Bankruptcy Code.  The Court discussed equitable subordination in detail in the *Dismissal Decision*, and denied dismissal because the *TAC* had adequately pled inequitable conduct. 515 B.R. at 157-61.  As with the willful blindness inquiry, there are triable issues of fact regarding Merkin's inequitable conduct, and summary judgment is thus inappropriate.  *Katz*, 462 B.R. at 456 (the Trustee may subordinate claims by "proving that the defendants invested with Madoff Securities with knowledge, or in reckless disregard, of its fraud").

Accordingly, the motion for summary judgment dismissing Count Thirteen is denied.

## CONCLUSION

For the reasons stated, the Motions are denied except with respect to the portion of Count Nine seeking to recover subsequent transfers from Ascot Partners.  The Court has considered the Defendants' remaining arguments and concludes that they lack

merit.  The parties are directed to submit a consensual order, or in the absence of

consent, to settle an order on notice.  The parties should also draft a pre-trial order

using the form linked to the Court's chambers rules, and schedule a final pre-trial

conference.

Dated: New York, New York
       January 30, 2017


                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge